No. 67,696

STATE OF KANSAS, *Appellee,* v. ANTHONY R. EDWARDS, *Appellant.*

(852 P.2d 98)

Opinion filed April 16, 1993.

*Jessica R. Kunen,* chief appellate defender, argued the cause, and *Wendy L. Rhyne Slayton,* assistant appellate defender, was with her on the brief for appellant.

*David Lowden,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Anthony R. Edwards appeals his jury trial convictions of second-degree murder (K.S.A. 21-3402) and unlawful possession of a firearm (K.S.A. 1992 Supp. 21-4204).

The charges arise from the death by gunshot of Timothy D. Moser which occurred on August 24, 1991, in an apartment located at 5024 Osie in Wichita. Inasmuch as two of the issues herein are very fact specific as to the events leading up to and resulting in Mr. Moser's death, to avoid repetition, further recitation of the facts will be reserved until the discussion of those issues.

## DISCHARGE OF A PROSPECTIVE JUROR

For his first issue on appeal, the defendant contends his statutory and constitutional right to be present at all stages of the trial was violated when the trial judge had a private conversation with a prospective juror.

The facts are as follows. The case was called for trial on the morning of October 21, 1991. Twelve prospective jurors were seated in the jury box and sworn. The trial judge made a few preliminary remarks, then, noting the time was 11:45 a.m., excused the jury panel until 1:30 p.m. Defense counsel desired to present a motion in limine, and that matter was set for 1:00 p.m.

After disposing of the motion as scheduled, the trial judge stated there was another matter he desired to discuss with counsel relative to an unseated member of the jury panel.

The court stated:

"There's another issue the Court wants to take. The Court's thought—I think I'm going to excuse Val James Brown, and, of course, if you know him, he's black. He's a doctor. He's known me all my life, plus he's got patients that need his help according to him. He's told me that he set there all uptight this morning. Incidentally, he is one that said he wanted to serve, but he said, you know—he said I want to serve, but, you know, somebody is going to suffer. I've had patients that I should have been to this morning. And I've thought it over at noon, and as of now, this time, from this moment it's my intent to excuse him. And I wanted to inform the—both counsel because I don't ever do anything like this without telling counsel. And the record's open to hear what objections there would be, and what—with the basis with me telling you all, the basis that I'm excusing, truthfully, as long as I've known him, I don't know whether or not my voice inflection or anything else he could pick up on and feel that I have, but I know that I've never did it. But I know most defense lawyers will ask in a minute, do you know anybody involved with this case. Do you know the Judge. It doesn't offend me because I can understand how they would feel that it could be some influence 'cause they certainly know my mannerisms. Well, I bet you he would know my mannerisms with anybody better than in this courtroom or on that jury, and I don't intend to ever reflect my feelings in regards to it, but there's some people that think they can read voices and body language, too. But I felt that I should inform you of why I'm going to excuse him. Further, that he didn't ask specifically, but he told me what—the problem with being excused, and what he said is, is it makes him uptight, and he was wondering whether or not he could give the attention that I told those jurors that they have under their oath had to give."

### Defense counsel responded as follows:

"MS. REED: I'm sorry, but I will have to object to excusing him. I can understand the Court's concern because of the hardship that it's presenting to him and the fact that he's having a hard time, but one of the difficulties that I have here in Sedgwick County and that my client has is that there's so few people of his race on jury panels. They're not usually representative of the population and that it makes it more difficult for him to receive a fair trial, particularly in this case, and I would have to say that it's a great concern with me in this particular case since all of the prosecution witnesses are going to be white and he's going to be black and—

"THE COURT: Is the deceased white?

"MS. REED: Yes. And so it's been one of my concerns since the beginning of this case."

### The trial court then stated:

I wasn't surprised with your reaction. That's your obligation to make your record, and I've given you that opportunity, and I think I've made mine sufficient to where the upper court would see why I did this. I think that

traditionally this Court has been very slow to excuse jurors, but I've been fairly lenient with doctors who have the responsibilities they have with patients who have problems because the Doctor told me that he had pending an appendectomy, and he was going to have to stand up and shout at the hospital, it was time to come, it's presumed. And an appendectomy, they're not easy. So that you are informed, the record's made. I'll excuse him now. I haven't—I brought the card in here. I brought this piece of paper to instruct them further downstairs to let him go this week. And, in fact, if he called and given me the same excuse, I'd have done what I usually do with doctors if I can find them believable and, of course, naturally I believe Dr. Brown no more than any others, but I do admit that I've known him for years, and I'm not doing it as a favor. I do know that he's busy, and so I'm going to write the note excusing him from jury period—jury service period this week."

There was some additional discussion in which defense counsel stated black clients preferred members of their own race as jurors even though such jurors might be "tougher on them."

At no time did defense counsel object to the fact she and her client were not present at the conversation between the judge and Dr. Brown, request the opportunity to make inquiry of Dr. Brown before a final decision on excusing him was made, or assert any statutory or constitutional rights violations relative to the way the Brown matter was handled. Rather, the objection was personal concern over losing a black person as a prospective juror. There is no indication in the record as to the racial composition of the venire or the jury ultimately selected.

K.S.A. 22-3405(1) provides:

"The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law."

The Sixth Amendment to the United States Constitution guarantees a defendant the right to be present at every stage of trial. *Illinois v. Allen,* 397 U.S. 337, 338, 25 L. Ed. 2d 353, 90 S. Ct. 1057, *reh. denied* 398 U.S. 915 (1970); *State v. Garcia,* 233 Kan. 589, 595, 664 P.2d 1343 (1983). When constitutional grounds are asserted for the first time on appeal, they are not properly before the appellate court for review. *State v. Goss,* 245 Kan. 189, Syl, ¶ 4, 777 P.2d 781 (1989). Although ordinarily an appellate court will not consider an issue which has not been raised in the trial court or which has not been raised by the parties on appeal, the

court does have the power to do so in exceptional circumstances, where consideration of the new issue is necessary to serve the interests of justice or to prevent a denial of fundamental rights. *State v. Puckett,* 230 Kan. 596, Syl. ¶ 1, 640 P.2d 1198 (1982).

Ex parte communications between a juror and the trial judge are improper. See *State v. Bowser,* 252 Kan. 582, Syl. ¶ 1, 847 P.2d 1231 (1993). Enormous bodies of case law have been developed on a defendant's right to be present at all stages of the proceedings, exceptions thereto, and various types of ex parte communications and the legal effects thereof. The facts herein do not warrant an extensive discussion as any error existing herein is so minimal. The communication was not between the judge and an impaneled juror, only a venireman. The discussion had nothing to do with the trial. Had the matter come up before trial, in an ex parte communication, or in voir dire of Dr. Brown, the trial court, in exercising its discretion, could have excused Dr. Brown from service under K.S.A. 43-159(c) as a person whose presence elsewhere is required for public welfare, health, or safety. The judge advised counsel of the conversation before taking any final action and afforded counsel full opportunity to be heard and to object. Defense counsel did not request the opportunity to inquire of Dr. Brown or raise statutory or constitutional objections in regard to the matter.

On a scale of one to ten, the alleged error herein is, at most, a one and, by any standard, harmless as to its effect. Any further discussion on this issue would serve no purpose.

### FAILURE TO GIVE A CAUTIONARY EYEWITNESS INSTRUCTION

For his second issue, the defendant contends the trial court's failure to give a cautionary eyewitness instruction was error. No such instruction was requested nor was any objection lodged to the court's proposed instructions.

The standard of review in such circumstances is set forth in *State v. Perkins,* 248 Kan. 760, Syl. ¶ 8, 811 P.2d 1142 (1991), as follows:

"A party may not assign as error the giving or failure to give an instruction unless he or she objects to the instruction, stating the specific grounds for the objection. Absent such objection, an appellate court may reverse only

if the trial court's failure to give the instruction was clearly erroneous. The failure to give an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there was a real possibility the jury would have returned a different verdict."

The cautionary eyewitness instruction contained in PIK Crim. 2d 52.20 is as follows:

"The law places the burden upon the state to identify the defendant. The law does not require the defendant to prove he has been wrongly identified. In weighing the reliability of eyewitness identification testimony you first should determine whether any of the following factors existed and if so the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting.

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence.

"3. Whether the witness had observed the defendant[s] on earlier occasions.

"4. Whether a significant amount of time elapsed between the crime charged and any later identification.

"5. Whether the witness ever failed to identify the defendant[s] or made any inconsistent identification.

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused.

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification."

In *State v. Warren,* 230 Kan. 385, Syl. ¶ 1, 635 P.2d 1236 (1981), we held:

"In any criminal action in which eyewitness identification is a critical part of the prosecution's case and there is a serious question about the reliability of the identification, a cautionary instruction should be given advising the jury as to the factors to be considered in weighing the credibility of the eyewitness identification testimony."

Was the failure to give a cautionary eyewitness instruction herein clearly erroneous? We believe not. This is not the factual situation in which questions on a cautionary eyewitness instruction usually arise. The eyewitness testimony under scrutiny is not that of a frightened victim of a stranger who was seen only fleetingly by the victim.

The facts herein are quite different. Mike McClellan was alone in his apartment at 8:00 p.m. on August 24, 1991. Shortly thereafter, five of his friends came to visit (Tim Moser, Kristy Twyford, Vince Larimore, James Blundell, and Debbie Blundell). Later, two other of Mike's friends stopped by, Anthony "Tony" Edwards (the defendant) and Terrell Smith. The group drank beer and played a drinking game. The apartment became hot and the group went outside to the porch to cool off. Later, all went back inside except Tim, Mike, and Terrell.

Mike noticed a handgun tucked in Terrell's waistband and commented, "That gun ain't loaded." Terrell disproved the statement by firing the gun into the ground. A neighbor, Brad Hilton, saw the incident, and Mike went over to talk with him. Music in Mike's apartment became loud, and Mike returned, asking for it to be turned down. Mike went back to Brad's. The music became loud again, and Mike returned, again asking that the volume be lowered. At this point, Terrell jumped on Mike. Terrell reached for his gun but it was gone as he had previously given it to the defendant, who then removed the bullets. Mike asked for the gun. The defendant gave it to Mike, who then checked to make sure it was unloaded and returned it to the defendant.

The drinking game resumed. Several of the individuals went back to the porch where it was cooler. Brad, who was 30 feet away, saw defendant and Tim arguing on the porch. The defendant then went into the apartment and entered the bathroom. He came out a short while later. As Tim started to walk back into the apartment, the defendant stated, "Fuck you, punk" and shot at Tim three or four times at close range. The defendant then ran out the back door of the apartment, holding the gun. Vince gave chase, tackled the defendant and put him in a headlock. During the chase, defendant attempted to shoot Vince, but the gun was empty. The defendant made his escape when Terrell kicked Vince in the head. The gun was later recovered in the grass. Tim, the victim, died from a gunshot wound to the chest. He had also been shot in the abdomen. The fatal bullet was identified as having come from the gun recovered at the scene.

At trial, Brad Hilton, his wife, Jessie, Debbie Blundell, and Vince Larimore all testified they saw defendant shoot Tim. The primary issue at trial was whether Terrell or the defendant shot

the victim. There was some inconsistency on this point at the time the police were summoned. Vince called 911 and stated Terrell had shot the victim.

Some additional facts are necessary. All of the people in Mike's apartment are white except for Terrell and the defendant, who are black. Terrell is tall and thin. The defendant is several inches shorter. The eyewitnesses from the apartment across the street (Brad and Jessie) at all times stated the short black man shot the victim. They had not met either black man and did not know their names, but were positive the short black man (the defendant) did the shooting. Vince testified he was excited when he made the 911 call and mixed up the names. He was positive defendant was Tim's killer. Debbie Blundell had met Terrell previously. She was positive in her identification of defendant as Tim's killer. Both Debbie and Vince had been in close proximity to Terrell and defendant in the apartment for hours before the shooting in a relatively relaxed, well-lighted atmosphere. Brad had observed Mike's guests for a lengthy period of time. It was undisputed defendant was the short black man present and that Terrell was the tall black man present. Identification of the defendant was not the issue. Rather, the issue was which of the two black men shot Tim.

We conclude the trial court's failure to give a cautionary eyewitness instruction was not clearly erroneous under the facts herein.

## SUFFICIENCY OF THE EVIDENCE

For his third issue, the defendant challenges the sufficiency of the evidence supporting his conviction of second-degree murder.

Murder in the second degree is the malicious killing of a human being, committed without deliberation or premeditation, and not in the perpetration or attempt to perpetrate a felony. K.S.A. 21-3402.

The standard of review when the sufficiency of evidence is challenged in a criminal case is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Grissom,* 251 Kan. 851, Syl. ¶ 4, 840 P.2d 1142 (1992); *State*

*v. Blackburn,* 251 Kan. 787, Syl. ¶ 1, 840 P.2d 497 (1992); *State v. Tyler,* 251 Kan. 616, Syl. ¶ 9, 840 P.2d 413 (1992).

Applying this standard, there is abundant evidence supporting the conviction. The defendant said "Fuck you, punk" to the unarmed victim and fired multiple .38 caliber shots at the victim at close range.

## APPLICATION OF K.S.A. 1992 SUPP. 21-4608 TO SENTENCES HEREIN

For his fourth issue, the defendant contends the trial court erroneously applied K.S.A. 1992 Supp. 21-4608 to the sentences imposed herein.

K.S.A. 1992 Supp. 21-4608 provides, in pertinent part:

"(1) When separate sentences of imprisonment for different crimes are imposed on a defendant on the same date, including sentences for crimes for which suspended sentences, probation or assignment to a community correctional services program have been revoked, such sentences shall run concurrently or consecutively as the court directs. Whenever the record is silent as to the manner in which two or more sentences imposed at the same time shall be served, they shall be served concurrently, except as provided in subsections (3), (4) and (5).

. . . .

"(3) Any person who is convicted and sentenced for a crime committed while on probation, assigned to a community correctional services program, on parole or on conditional release for a felony shall serve the sentence consecutively to the term or terms under which the person was on probation, assigned to a community correctional services program or on parole or conditional release."

The pertinent facts are as follows. Defendant had previously been convicted of conspiracy to possess cocaine in case No. 91 CR 410 (Sedgwick County). The sequence of events is as follows:

1/27/91   Defendant arrested for possession of cocaine. (Case No. 91 CR 410.)

7/18/91   Pled guilty to conspiring to possess cocaine.

8/7/91    Received a two-year suspended sentence.

8/24/91   Committed crimes herein.

8/27/91   Charged in case at bar. (Case No. 91 CR 1317.)

10/25/91  Found guilty of counts charged.

11/25/91  Suspended sentence revoked; sentenced to 1-5 years on cocaine charge; sentences imposed in case at bar.

In *State v. Ashley*, 236 Kan. 551, Syl. ¶ 1, 693 P.2d 1168 (1985), we held that suspended sentences were included in the meaning of probation in the consecutive sentencing statute, then K.S.A. 1983 Supp. 21-4608(3). However, in *Ashley*, the suspended sentences were revoked and the defendant sentenced thereon some two months before the sentencing occurred on the new convictions. Thus, subsection (1) of the statute was inapplicable.

It should be noted that the form of the statute was slightly different in *Ashley*. The statute (K.S.A. 1983 Supp. 21-4608) then provided:

"(1) When separate sentences of imprisonment for different crimes are imposed on a defendant on the same date, including sentences for crimes for which suspended sentences or probation have been revoked, such sentences shall run concurrently or consecutively as the court directs. Whenever the record is silent as to the manner in which two or more sentences imposed at the same time shall be served, they shall be served concurrently.

. . . .

"(3) Any person who is convicted and sentenced for a crime committed while on probation, parole or conditional release for a felony shall serve the sentence consecutively to the term or terms under which the person was on probation or released."

The last sentence in K.S.A. 1992 Supp. 21-4608 (1) which states "except as provided in subsections (3), (4) and (5)" applies only when the record is silent as to whether the sentences are to run concurrently or consecutively. Here, the record is not silent as to how the sentences shall be served. The trial court stated the sentences herein would be consecutive to that of the cocaine sentence.

The record is clear that the trial court believed subsection (3) controlled and, accordingly, that consecutive sentencing was mandatory. We do not agree.

When a statute is clear and unambiguous, the court must give effect to the legislative intent therein expressed rather than make a determination of what the law should or should not be. Thus, no room is left for statutory construction. *In re Mary P.*, 237 Kan. 456, Syl. ¶ 1, 701 P.2d 681 (1985). General and special statutes should be read together and harmonized whenever possible, but to the extent a conflict between them exists, the special statute will prevail unless it appears the legislature intended to

make the general statute controlling. *Kansas Racing Management, Inc. v. Kansas Racing Comm'n,* 244 Kan. 343, 353, 770 P.2d 423 (1989). The court is required to strictly construe penal statutes in favor of the accused. This rule of strict construction, however, is subordinate to the rule that judicial interpretation must be reasonable and sensible to effect legislative design and intent. *State v. Tyler,* 251 Kan. 616, Syl. ¶ 15.

The legislature may well have intended to make consecutive sentencing mandatory under the circumstances herein, but the clear language of the statute does not so indicate. Under such circumstances there is no room for judicial construction. Subsection (1) is a specific statute applied when all involved sentences occur, as here, *on the same date* and takes precedence over subsection (3) of said statute.

The trial court did not exercise discretion in determining under subsection (1) whether to impose the sentences concurrently or consecutively. Rather, the trial court imposed consecutive sentences on the basis such was mandatory under subsection (3). We conclude the sentences herein must be vacated and the case remanded for resentencing, applying K.S.A. 1992 Supp. 21-4608(1).

## SENTENCING UNDER K.S.A. 1992 SUPP. 21-4618

For his final issue, the defendant contends the district court erred in applying K.S.A. 1992 Supp. 21-4618 to his conviction for unlawful possession of a firearm (K.S.A. 1992 Supp. 21-4204).

K.S.A. 1992 Supp. 21-4618 provides:

"(1) Except as provided in subsection (3), probation, assignment to a community correctional services program or suspension of sentence shall not be granted to any defendant who is convicted of the commission of the crime of rape, the crime of aggravated sodomy or any crime set out in article 34 of chapter 21 of the Kansas Statutes Annotated in which the defendant used any firearm in the commission thereof and such defendant shall be sentenced to not less than the minimum sentence of imprisonment authorized by law for that crime. This section shall not apply to any crime committed by a person under 18 years of age.

"(2) When a court has sentenced a defendant as provided above, the court shall state in the sentencing order of the judgment form or journal entry, whichever is delivered with the defendant to the correctional institution, that the defendant has been sentenced pursuant to this K.S.A. 21-4618 and

amendments thereto based on a finding by the court that a firearm was so used.

"(3) The provisions of this section shall not apply to any crime committed by a person where such application would result in a manifest injustice."

It is uncontroverted that K.S.A. 1992 Supp. 21-4618 was properly applied to the second-degree murder conviction. Inasmuch as unlawful possession of a firearm is not an article 34 crime, or rape, or aggravated sodomy, application of 21-4618 to such conviction would be erroneous. The record at sentencing does not show any discussion of 21-4618 relative to the firearm charge.

The journal entry states, in pertinent part: "Defendant is hereby committed to the custody of the Secretary of Corrections . . . for a period of not less than two (2) years nor more than ten (10) years on the charge of Unlawful Possession of Firearm, Count Two, contrary to K.S.A. 21-4204, and in accordance with K.S.A. 21-4501(d) and *K.S.A. 21-4618.*" (Emphasis supplied.)

The State contends the last phrase thereof, "and K.S.A. 21-4618" is an error which occurred through mistake or inadvertence and should be corrected by deleting the same through amendment or a nunc pro tunc order. Ordinarily, this procedure would adequately correct the error. However, inasmuch as we have vacated these sentences under the preceding issue, and the defendant will be resentenced on this conviction with a new journal entry being prepared thereon, there is nothing to be gained by correcting the journal entry on the original sentencing.

The convictions are affirmed, the sentences imposed herein are vacated, and the case is remanded for resentencing.