No. 88,085

STATE OF KANSAS, *Appellee*, v. GORDON R. MARTIS, JR., *Appellant*.

(83 P.3d 1216)

Opinion filed February 6, 2004.

*Reid T. Nelson,* capital and conflicts appellate defender, argued the cause, and was on the briefs for appellant.

*Sheryl L. Lidtke,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Gordon R. Martis, Jr., appeals his convictions and sentences for one count each of premeditated first-degree murder, second-degree murder, attempted first-degree murder, and attempted second-degree murder. He alleges seven errors, each of which would require reversal of his convictions. Among the seven, one presents itself as a question of first impression in Kansas. The defendant alleges that two of his convictions grew out of one count, which is prohibited by law. The six other allegations of error involve the defendant's right of cross-examination, exclusion of defense

evidence, improper testimony from a State's witness, automatic exclusion of potential jurors, the constitutionality of both the hard 40 sentence and the first-degree murder statute, and jury instructions. We conclude that no reversible error occurred and affirm.

During the early evening hours of May 18, 1999, four of the five occupants of a vehicle located in a parking lot across the street from Mr. B's nightclub in Wyandotte County were shot while sitting in a vehicle. Andrea Williams was shot in her right leg, hip, buttock, and vagina but recovered. Stacey Wilson was shot in the back but also recovered. Alfonzo Moore was shot in the heart and died from his wound. Jerry Seals was shot multiple times (nine gunshot wounds) and died as a result of his wounds. In the original information, Martis was charged with first-degree premeditated murder of both Moore and Seals. By amended information, the defendant was charged with one count of capital murder under the provisions of K.S.A. 21-3439(a)(6). However, upon trial the defendant was convicted based upon the lesser included offense instructions he requested of first-degree premeditated murder (Moore) and second-degree intentional murder (Seals).

Martis was also charged with attempted murder of Williams and Wilson. He was convicted of attempted first-degree premeditated murder of Wilson and attempted second-degree intentional murder of Williams. He received a hard 40 sentence on the premeditated murder conviction. The remaining sentences, life imprisonment without the possibility of parole for 10 years on the second-degree murder, 268 months' imprisonment for attempted first-degree murder, and 194 months' imprisonment for attempted second-degree murder, were run concurrent with the hard 40 sentence.

The rationale of the jury findings of guilt echos the evidence at trial indicating that Martis, consistent with his threat 3 days before the shooting, intended to kill both Moore and Wilson, thus establishing the convictions of first-degree premeditated murder of Moore and attempted first-degree premeditated murder of Wilson. However, the jury concluded that he intended to kill the other occupants but had not premeditated their killing. Thus, he was

convicted of second-degree intentional murder of Seals and attempted second-degree intentional murder of Williams.

Andrea Williams, Loya Qur-an Fuel, Mercedes Sappington, and Darwin Bagley all identified the defendant at trial as the shooter. Williams testified that on the evening of May 18, 1999, she met Wilson and Moore, who were dating, and Seals, whom she was dating, around 8 or 9 p.m. Williams, Moore, and Wilson smoked marijuana while they drove to see a movie. After the movie, they purchased alcohol and drank it on the way to Mr. B's nightclub. Wilson was driving Moore's car, while Moore was in the front passenger seat and Seals and Williams were in the back seat.

Wilson drove down a side street to see who was standing in front of the club, and Williams saw the defendant and Rashida Johnson, the defendant's girlfriend and mother of his children, among several others standing outside of the club. (The defendant and Johnson were subsequently married.) Williams knew the defendant because he had dated Wilson. While Wilson circled a parking lot across the street from the club, Fuel, the mother of Moore's children, walked across the street and looked into the car. Wilson stepped on the gas to scare Fuel and then drove away to pick up Wilson's cousin, Fredrick Howard, at his residence.

Moore got into the back passenger seat to allow Howard to sit in the front passenger seat. Williams moved into the middle of the back seat and Seals was sitting in the driver's side back seat. Wilson drove back to the club and pulled into the lot across the street. Fuel walked across the street, snatched open the driver's side door, called Wilson a bitch, and tried to get at her. Wilson backed the car up in response, and Fuel continued to try to get in the door until the shooting started.

Williams testified that the defendant shot Wilson first and then shot more than 10 times into the back seat. She could see the defendant and the barrel of the gun through the driver's side back window, and he was close enough that she would have been able to touch the gun. She did not recall a pause in the shooting.

After the shooting stopped, Wilson tried to drive away but she passed out. Howard, who was the only person not shot, got into the driver's seat and drove most of the way to the hospital. Williams

called on her cellular phone and told her sister that the defendant had shot her. Howard got out of the car 2 blocks from the hospital because he was concerned about his outstanding warrants. Wilson drove the remainder of the way to the hospital where she and Williams were treated for gunshot wounds.

In his cross-examination of Williams, defense counsel pointed out that Williams was on probation at the time of the shooting for theft and a warrant was issued for her arrest in Wyandotte County for worthless checks a few months before trial.

Howard testified that when they drove up to the nightclub, a girl ran up to the car and hit the windshield. Wilson started backing into a parking lot, and someone started shooting on the driver's side of the car. Howard got down on the floorboard of the passenger side and did not see the shooter. He estimated 12 to 13 shots were fired.

Fuel testified that she went to a barbecue at the defendant and Johnson's home earlier that day. Fuel did not consume any alcohol, but she observed the defendant drink beer. The barbecue lasted about 4 or 5 hours before people started leaving to go to Mr. B's. Fuel went to the club with Johnson, Johnson's sister M'Sherie Johnson, and Jamie Gaskin. They hung out in front of the club for about a half hour before she saw Wilson and Moore drive by in Moore's car. Wilson turned around and drove past again and was gone for about 10 minutes. Fuel testified that Moore's car returned and parked near the club for about 15-20 minutes, but no one got out of the car. Wilson pulled up on the side of the building very slowly, and Fuel ran to the car and tried to open the passenger door, but it was locked. She denied hitting the windshield.

Fuel followed the car across the street and snatched open the driver's side door. Wilson put the car in reverse, and the door swung shut. Fuel recognized the defendant's voice say, "[B]itch, what I tell you, what I tell you." She did not see the defendant, but she had no doubt in her mind that it was him. She saw the gun and ran away to the sound of multiple gunshots. The defendant subsequently ran past her while she was running up a hill. Fuel called Moore's mother on a cellular phone and told her that she

was trying to fight Wilson and the defendant had run up to the car and started shooting.

Mercedes Sappington testified that she stopped by the barbecue with her friends Shatia Brown, Kimberly Norman, and Latoya Davis. She testified that she drank alcohol and smoked "wet" (marijuana cigarettes dipped in PCP), and she observed the defendant do the same. She went to Mr. B's with her friends around 11 p.m., and they stood outside for about a half hour smoking marijuana. They got back into their car; then Johnson and her sister, Gaskin, and Fuel walked to their car and started talking to them. Sappington testified that Wilson and Moore drove by and swerved their car and that Fuel started chasing them after they passed. Wilson drove by again, almost hitting Fuel, and then drove away for nearly 10 minutes.

Sappington further testified that when Wilson returned, Fuel ran across the street, banged on the car, and tried to get Wilson to get out of the car. Sappington was standing with Darwin Bagley and watched the defendant walk up to the driver's side of the car. Fuel looked at the defendant and then ran off screaming. The defendant said something to Wilson before shooting three times through the front window at her. He then shot more than six times at the back seat before running away.

Bagley, Moore's nephew, testified that he went to Mr. B's that evening and arrived when Wilson was driving the car up 22nd Street. Bagley followed after Fuel on foot and tried to get her to stop yelling at Wilson. He watched Fuel bang on Moore's car and saw the defendant flick her out of the way, and then she ran. Bagley testified that the defendant fired two shots, his gun jammed, and then it went off one more time. The defendant started to leave, then looked into the back window and fired the remainder of the bullets before running away. Bagley hit the hood of the car, and told Wilson to leave.

Sappington identified the defendant's weapon as a .40 caliber gun, and Bagley described it as either a 9 mm. or a .40 caliber automatic handgun. Michael W. Ennis, a firearm and toolmark examiner with the FBI, identified all of the bullets found in the vehicle and in the bodies of victims as being .40 caliber bullets.

The defense thoroughly cross-examined Sappington and Bagley about inconsistencies between their trial testimony and the statements they had made to the police shortly after the incident. The defense elicited testimony that Sappington had convictions for theft and felony obstruction of a law enforcement officer and Bagley had a juvenile conviction for robbery.

Lieutenant Terrence Hall and Detective Roger Golubski responded to the hospital shortly after midnight. Lieutenant Hall spoke with Williams and Bagley, who both identified the defendant as the shooter.

Stacey Wilson's mother, Joyce Wilson, told the officers that on May 16, 1999, the defendant came to her house and threatened to kill Moore and Stacey Wilson. Shardale Roark told the detective that she was present when the defendant made this threat. Later that day, Detective Golubski interviewed Fuel and Sappington, who both identified the defendant as the shooter.

A warrant was issued for the defendant's arrest, and he turned himself in on May 25, 1999. In September and October 1999, the detective obtained four letters written to Wilson by the defendant while he was in jail, and they were read to the jury at trial.

Prior to trial, the defense sought to prevent the State from introducing evidence surrounding the unsolved homicide of Stacey Wilson, which occurred in September 1999, as the jury might infer that the defendant had played a role in her death. The circumstances surrounding her death were not discussed at trial, and the jury was simply instructed that Stacey Wilson died in September 1999 from injuries unrelated to those she had received in the shooting.

Joyce Wilson testified at trial that her daughter dated the defendant for a year but started seeing Moore a week before the shooting. On Sunday, May 16, 1999, Joyce Wilson took part in a conversation with the defendant and Stacey Wilson at Roark's residence. The defendant talked about Stacey Wilson seeing Moore, and she told the defendant that he had to make a choice between her and Johnson. The defendant replied that he was going to "kill them niggers" and if Stacey was in the car, "I'm going to get you, too." Stacey Wilson's 12-year-old daughter testified at trial that she

witnessed her mother talking to the defendant about Moore, and he said, "[B]itch, if I see you with him I'm going to kill you and him."

Florice Easterwood testified for the defense that the shooter was a short, dark-skinned African-American male and the defendant's skin color did not match the person she observed during the incident. Michael Banks, Rashida Johnson's uncle, testified that the defendant was standing with Johnson in front of Mr. B's when the gunshots were fired. Johnson's sister, M'Sherie Johnson, corroborated this testimony. Tenisha Higginbotham, the defendant's cousin, testified that she was talking to the defendant when the "situation kicked off."

## 1. Was it error for the defendant to be convicted and sentenced for two separate crimes under one count of capital murder?

While the defendant argues that the trial court erred in denying his motion to arrest judgment, his real concern is that he was convicted of two counts of murder when he was only charged with one count of capital murder. In rejecting the defendant's posttrial motion on this issue, the trial court indicated that his arguments on his motion to arrest judgment had already been dealt with extensively on the record. The issue raised by the defendant is ripe for resolution and constitutes a question of first impression in this state.

The amended information charged the defendant in Count I with capital murder, alleging that the defendant

"did unlawfully, feloniously, intentionally and with premeditation, kill more than one person, to-wit: Alfonzo Moore and Jerry Seals, as part of the same act or transaction or in two or more acts or transactions connected together or constituting part of a common scheme or course of conduct, in violation of K.S.A. 21-3439."

Under Count I, the jury was instructed that to establish the crime of capital murder, it must be proven:

"1. That the defendant intentionally killed more than one person, to-wit: Alfonzo Moore and Jerry Seals;
"2. That such killings were done with premeditation;

"3. That the premeditated and intentional killing of Alfonzo Moore and Jerry Seals was a part of the same act or transaction or constituted parts of a common scheme or course of conduct; [and]

"4. That this act occurred on or about the 19th day of May, 1999, in Wyandotte County, Kansas."

At the defendant's request, the jury was instructed that under Count I, it could consider the lesser included offenses of first-degree and second-degree murder of Moore, and the lesser included offenses of first-degree and second-degree murder of Seals. Instruction 12 provided:

"If you do not agree that the defendant is guilty of Capital Murder in Count I, you should then consider the lesser included offense of Murder in the First Degree.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant intentionally killed Alfonzo Moore;

"2. That such killing was done with premeditation; and

"3. That this act occurred on or about the 19th day of May, 1999, in Wyandotte County, Kansas."

Instruction 13 was a second-degree intentional murder instruction regarding victim Moore. Instructions 14 and 15 were identical to Instructions 12 and 13 except that the named victim was Seals.

On May 10, 2001, the jury found the defendant guilty of the premeditated murder of Moore and the second-degree intentional murder of Seals.

The first question to be addressed is whether the amended information prejudiced the defendant so as to infringe upon his right to a fair trial. The standard of review in this case is the post-*Hall* standard. See *State v. Hall*, 246 Kan. 728, Syl. ¶¶ 12 and 13, 793 P.2d 737 (1990). The post-*Hall* standard applies a common-sense interpretation of complaints and informations and requires this court to look at whether the claimed defect in the information has prejudiced the defendant in the preparation of his or her defense, impaired the defendant's ability to plead the conviction in any subsequent prosecution, or limited the defendant's substantial rights to a fair trial. 246 Kan. at 764-65.

The defendant's ability to prepare a defense was not prejudiced because the amended information charged him with the premed-

itated murder of both Moore and Seals. The defendant does not claim that his ability to plead the conviction in a subsequent prosecution was impaired. The defendant does argue that his substantial rights were prejudiced because he was convicted of an additional uncharged crime.

In support of his argument, the defendant cites the following two statutes. First, K.S.A. 2002 Supp. 22-3201(e) provides that "[t]he court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." The defendant emphasizes the language "if no additional or different crime is charged," concluding that this statute contemplates one crime per count. The amended information in this case charged one count of capital murder by the premeditated murders of Moore and Seals. See K.S.A. 21-3439(a)(6).

One crime, capital murder, was charged in one count containing two counts of first-degree premeditated murder as lesser included offenses. Thus, based upon the evidence at trial and the defendant's request for lesser included offense instructions, the trial court was required to instruct the jury on the lesser included offenses for both the murder of Moore and Seals. No additional or different crime was charged. The amended information and the lesser included offenses arising out of the amended information satisfied the provisions of K.S.A. 2002 Supp. 22-3201(e) under the unique provisions of K.S.A. 21-3439(a)(6).

Second, K.S.A. 2002 Supp. 21-3107(1) provides that "[w]hen the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment." Subsection (2) provides that "[u]pon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both. A lesser included crime is: . . . (b) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 2002 Supp. 21-3107(2)(b).

The defendant argues that a reasonable construction of 21-3107 is that a defendant may only be convicted of the crime charged or one lesser degree of that crime. He argues that the jury instructions were broader than the charges contained in the amended information and that the prosecution should have charged two alternative counts of premeditated murder in order to obtain convictions of more than one crime.

The State argues that the defendant in this case was implicitly charged with committing two separate premeditated intentional killings by virtue of K.S.A. 21-3429(a)(6), that appellate courts no longer impose an affirmative duty on trial courts to give lesser included instructions, and that lesser included instructions under 21-3429(a)(6) will naturally be different as it is the only method of capital murder which requires the State to prove two distinct premeditated killings.

We agree with the State. K.S.A. 21-3439(a)(6) defines capital murder as the "intentional and premeditated killing of more than one person as part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." We also partially agree with the defendant that the prosecutor in this case could have charged two alternative lesser included counts of premeditated murder. We do not agree that by filing only the capital-murder charge the prosecutor violated the provisions of K.S.A. 2002 Supp. 21-3107.

The first-degree premeditated murders alleged in the amended information charging capital murder under K.S.A. 21-3439(a)(6) are lesser included offenses of capital murder. In *State v. Bradford*, 272 Kan. 523, 34 P.3d 434 (2001), Bradford was convicted of capital murder for the intentional and premeditated killings of two women under K.S.A. 21-3439(a)(6). While addressing the requirement that Bradford receive a voluntary intoxication instruction on his specific intent crimes, we noted that such an instruction was given for "capital murder, lesser included offenses of first-degree murder or felony murder, and aggravated burglary." 272 Kan. at 535. The PIK Committee correctly identifies murder in the first

degree as a lesser included offense of capital murder. See PIK Crim. 3d 56.01.

Under the provisions of K.S.A. 2002 Supp. 21-3107, the defendant was charged with one crime, capital murder. More than one crime was not charged. However, the amended information charging capital murder alleged the premeditated murders of Moore and Seals. The provisions of 21-3107 provide that a defendant may be convicted of either the crime charged or a lesser included crime, but not both. Here, the defendant was convicted of the lesser included offenses of first-degree murder of Moore and second-degree murder of Seals. He was not convicted of both the crime charged and lesser included crimes. The defendant's argument that the jury instructions were broader than the charges contained in the information is correct, but there was no violation of K.S.A. 2002 Supp. 21-3107 and the unique provisions of K.S.A. 21-3439(a)(6) required such instructions.

The amended information in this case advised that the defendant was facing only one capital murder charge, but he was convicted and sentenced for two separate lesser included crimes under that count. However, the lesser included offenses of a capital murder charge under K.S.A. 21-3439(a)(6) include two first-degree premeditated murders in addition to other lesser offenses of first-degree murder. If we adopt the argument of the defendant, the trial court had two options: First, to instruct the jury on a lesser included instruction for only one of the murder charges or second, to give no lesser included offense instructions under K.S.A. 21-3439(a)(6). Both options would have prejudiced the defendant and denied him a fair trial. These options would lead to illogical results because a defendant who was charged with two counts of premeditated first-degree murder would be entitled to lesser included offenses, but a defendant charged with capital murder and facing the death penalty for committing two premeditated murders would be entitled to no lesser included offense instructions or would only be entitled to one lesser included offense instruction under K.S.A. 21-3439(a)(6).

The result of jury deliberations in this case with lesser included offense instructions for the murders of both Moore and Seals under

the provisions of K.S.A. 21-3439(a)(6) demonstrates the fairness to the defendant. In a case such as this where the defendant requests lesser included instructions and the evidence supports the giving of such instructions for both victims, K.S.A. 21-3439(a)(6) requires the trial court to instruct on each lesser included offenses for each victim. After considering PIK Crim. 3d 56.01, *Bradford,* and the consequences of the parties' arguments, we conclude that the trial court's decision to instruct on lesser included offenses for each victim was correct. The amended information in this case put the defendant on notice that he was alleged to have killed two people with premeditation and the penalty could be as severe as death. Neither K.S.A. 2002 Supp. 22-3201(e) nor K.S.A. 2002 Supp. 21-3107 limit lesser included offenses to consisting of only one count. Under this particular subsection of the capital-murder statute, the lesser included offenses necessarily include two or more separate counts of first-degree murder.

## 2. Limitation of Cross-Examination

### Mercedes Sappington

Mercedes Sappington was called as an eyewitness to attest to the fact that the defendant was the shooter during the incident. She had given her statement to the police at the time the homicides were committed. At that time, no charges were pending in Wyandotte County against her. Approximately 2 years later, just prior to the defendant's trial, Sappington was charged by the Wyandotte County's prosecutor's office with felony criminal damage to property, a crime not involving dishonesty. Prior to her testimony, the defendant sought permission to cross-examine Sappington on the pending charge, advancing the following rationale:

"Judge, the basic premise here is that I think the jury should have the opportunity to determine whether the fact that Ms. Lidtke's [Prosecutor] office is prosecuting her for a felony—should the jury be able to consider that in terms of maybe that would influence her testimony, not there is a deal. I stipulate there is not a deal. But this witness doesn't know she can't get the deal.

. . . .

"[T]he crux of our position is the fact that the DA's office for whom she is the very witness is the one that really controls her destiny and she might think that's important. . . .

"I think I should be able to ask her isn't she currently being prosecuted by the Wyandotte County district attorney's office for—I don't know what felony it is. I think it's criminal damage. Maybe it's a misdemeanor. . . . But she is being prosecuted. I think whether it's a felony or misdemeanor makes little difference. She is being prosecuted by the district attorney's office. I think that's the question."

The court denied this motion. After Sappington testified on direct, the court stuck to its initial ruling and refused to allow the defendant to cross-examine her about the pending Wyandotte County case against her. The court reasoned that it would leave an unfair impression with the jury that she was testifying falsely because she had made a deal with the State, with no evidence to support such an inference, and with the stipulation of the defendant that no deal had even been discussed with the witness.

The defendant advances the same arguments before this court, claiming that the defense was prevented from pointing out that Sappington had a motive to lie for the prosecution, which requires reversal of his convictions.

The admission of evidence lies within the sound discretion of the trial court. Our standard of review regarding a trial court's ruling on evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. *State. v. Jenkins*, 272 Kan. 1366, 1378, 39 P.3d 47 (2002).

The defendant couches his argument in a constitutional context, arguing that the court's limitation of his right to cross-examine Sappington on her pending charge denied him due process rights under the federal and state Constitutions to present a defense and his right to effective cross-examination. See *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973); *Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). Acknowledging that the trial court's ruling is subject to a harmless error analysis, the defendant claims that the limitation was not

harmless, thereby entitling him to a new trial. See *Pennsylvania v. Ritchie*, 480 U.S. 39, 53-58, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987).

Before examining the defendant's authority, we note that the defendant's cross-examination was thorough and limited only with respect to Sappington's pending charge. The defendant was allowed to exploit all inconsistencies in her original statement compared to her trial testimony and was allowed to ask about several convictions she had for crimes of dishonesty. Although the defendant was denied cross-examination on the pending charge, Sappington appeared on the stand in an orange jump suit, which is traditional prison garb. Also before addressing the defendant's constitutional concerns, the State's rules of evidence must be examined concerning the admissibility of the witness' pending charge.

The defendant sought to introduce evidence of a pending crime which did not involve dishonesty or false statement. K.S.A. 60-420 provides in this regard:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

K.S.A. 60-421 provides in pertinent part: "Evidence of the conviction of a witness for a crime not involving dishonesty or false statement shall be inadmissible for the purpose of impairing his or her credibility."

Finally, K.S.A. 60-422 provides:

"As affecting the credibility of a witness (a) in examining the witness as to a statement made by him or her in writing inconsistent with any part of his or her testimony it shall not be necessary to show or read to the witness any part of the writing provided that if the judge deems it feasible the time and place of the writing and the name of the person addressed, if any, shall be indicated to the witness; (b) extrinsic evidence of prior contradictory statements, whether oral or written, made by the witness, may in the discretion of the judge be excluded unless the witness was so examined while testifying as to give him or her an opportunity to identify, explain or deny the statement; (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

This court has applied K.S.A. 60-421 to prevent defense counsel from cross-examining a State's witness concerning a charge of first-degree murder then pending against him in Wyandotte County. Even though the witness had agreed to enter a plea as the result of plea negotiations on the charge, we held that evidence of the pending charge was inadmissible to impeach the witness' credibility because the plea had not been accepted and there was not a conviction as required by K.S.A. 60-421. *State v. Lomax*, 227 Kan. 651, 655, 608 P. 2d 959 (1980). A similar result was reached in *State v. Handley*, 234 Kan. 454, 673 P.2d 1155 (1983), wherein the State informed the defense that the complaining witness had no criminal history but did have charges pending against him for misdemeanor theft. The day after the defendant was convicted, the witness pled guilty to the charge in municipal court. The defendant argued on appeal that he was entitled to a new trial because the prosecution withheld information regarding the complaining witness' criminal history. We rejected this argument, reasoning that "[e]vidence of a pending charge against a witness, which has not resulted in a conviction, is inadmissible to impeach the witness' credibility. K.S.A. 60-421 specifically requires a conviction before evidence of a crime is admissible for that purpose." 234 Kan. 454, Syl. ¶ 9.

However, in *State v. Wesson*, 247 Kan. 639, 802 P.2d 574 (1990), *cert. denied* 501 U.S. 1236 (1991), the State attempted to admit evidence that a defense witness had been in the same jail cell as the defendant to show that based upon a relationship established while sharing a cell with the defendant, the witness was biased. The defendant argued that the State was attacking the witness' credibility on the basis of a crime charged without conviction. The trial court permitted the State to ask if the witness had been in jail with the defendant, provided that only the least severe crime was referenced.

On appeal, this court upheld its interpretation of K.S.A. 60-421 in *Handley* but concluded that the defendant's application of *Handley* to his case was not correct. The *Wesson* court cited K.S.A. 60-420 and reasoned that the State was trying to show bias on the witness' behalf, that it was not the crime the State was concerned with but the fact that the witness shared a jail cell with the de-

fendant, and that the trial court had allowed the State to inquire about the charge in order to minimize any unwarranted conclusions on the part of the jury. The court concluded that the evidence was not prohibited by K.S.A. 60-421. 247 Kan. at 651-52.

The defendant's argument seems to gain support from *Wesson* because in both cases the charged crime becomes incidental to the relationship between the witness and another person, which relationship the defendant argues impeaches the credibility of the witness. However, there is a marked difference between *Wesson* and the case we now consider. The relationship in *Wesson* became probative on the issue of credibility for it is more than likely that the friendship between the witness and the defendant might have affected the witness' testimony. However, in this case, the filing of a felony charge not involving truth or veracity by the prosecutor against a witness who was testifying on the prosecutor's behalf, without any other evidence, lacks probity in establishing that the witness would testify falsely because of the pending charge. This is especially true in this case where the charge comes almost 2 years after the witness had given her statement to the police and where there is no evidence the charge was discussed with the witness in preparing her for trial. Moreover, the admission of such evidence is directly contrary to K.S.A. 60-421; evidence of a pending charge against a witness which has not resulted in a conviction is inadmissible to impeach the witness' credibility. See *Handley*, 234 Kan. 454 Syl. ¶ 9; *Lomax*, 227 Kan. at 655.

The question of admissibility lies within the sound discretion of the trial court. In light of the above law and the facts, we conclude that the trial court did not abuse its discretion in precluding cross-examination on Sappington's pending charge of felony damage to property.

The cases relied upon by the defendant do not involve pending charges. *Chambers*, 410 U.S. 284, establishes a defendant's constitutional right to present a defense. The ruling of the trial court in this case did not affect the defendant's due process right to present a defense. *Davis*, 415 U.S. 308, affirms the defendant's right to expose a witness' motivation in testifying through cross-examination. However, in *Davis*, the witness was on probation at

the time he testified and also was a suspect in the crime being prosecuted. It was within this context that the Court declared: "The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." 415 U.S. at 316. The claim of bias the defense sought to develop was admissible to show the witness' vulnerable status as a probationer as well as the witness' possible concern that he might be a suspect in the investigation. 415 U.S. at 317-18. Such facts do not exist in this case, as the defendant offers only the pending charge brought some 2 years after the witness gave her statement to the police as the basis for admissibility.

## Darwin Bagley

Subsequent to Bagley's testimony, the defense advised the court that it had learned that Bagley was arrested immediately after testifying. Defense counsel explained: "That would lead us to ask if he was aware he had pending charges and he knew about them. We are back into the Sappington issue, *i.e.*, should we have been able to cross-examine him on current charges whether he's currying favor with the prosecution, the governmental entity." The defense asked for copies of any reports in connection with the investigation to determine whether Bagley believed he could make a deal with the prosecution.

The prosecutor responded that similar to the Sappington issue, Bagley's pending charges were irrelevant because his testimony was entirely consistent with the statement he gave on the day of incident. The prosecutor acknowledged that the defendant had been arrested on drug charges in Wyandotte County, but she denied knowledge that a warrant had been filed until after Bagley was arrested.

The trial court subsequently informed the defense that Bagley had been arrested on April 19, 2000, held in custody for 20 hours, and then released pending charges. Charges were filed on April 27, 2000, alleging he sold cocaine and was in the possession of cocaine with the intent to sell, and a warrant was issued the same day. Bagley was arrested on May 1, 2000, immediately after testifying on behalf of the State. The trial court permitted defense

counsel to further inquire about any communications between the prosecutor's office and the defendant regarding his testimony in this case.

Ultimately, the trial judge concluded:

"I don't know how I could have provided anything more to the defense on what apparently seemed to be a long shot, I guess, would be understatement. But I think a review of the police reports by the defense as well as a review of the video of the statements that he made at the time that he was arrested that were shown to the defense on Friday, I guess I believe that those things satisfy what the defense was requesting as to Mr. Bagley and I'm not going to allow any more."

The State argues that the trial court never limited the cross-examination of Bagley because the defendant merely sought discovery on this issue and never specifically sought to recall Bagley as his own witness on this issue. However, it is clear from the record that the defendant was seeking to raise the Sappington argument regarding Bagley's pending charges. Prior to the trial court's final ruling, the defense renewed its request to be able to cross-examine Bagley about the existing warrant, contending it was a violation of the defendant's constitutional rights to due process and cross-examination of witnesses. The trial court ultimately concluded that there was not "any basis to bring Mr. Bagley in for examination."

The issue raised by the defendant, while not clearly articulated, is that he should have been able to recall Bagley and expose the pending charges against him for impeachment purposes. As with Sappington, the charges were filed long after he gave his initial statement to the police. The defendant was afforded complete discovery concerning the pending charges, and it was revealed that the prosecutor had not discussed these charges with Bagley in preparation for trial. Thus, as with Sappington, the only basis for impeachment was the mere existence of the pending charges. We have addressed this contention and need not further discuss the defendant's allegation except to refer to our disposition in regard to the Sappington claim above.

## 3. Exclusion of Evidence

Prior to the shooting, the defendant had a romantic relationship with Stacey Wilson, one of the shooting victims. When Wilson be-

gan dating Moore, the defendant threatened to kill her and Moore. Wilson died prior to trial as a result of an unsolved homicide in September 1999. Prior to her death but after the shooting, Wilson wrote two letters to the defendant while he was in jail. In these letters, Wilson professed her love for the defendant. The defendant tried to introduce both letters during the trial as evidence that the victim would not have professed her love for him if he had attempted to kill her on the night of the incident.

The defendant successfully entered the second letter into evidence, but the first letter dated May 30, 1999, was excluded by the trial court. Prior to trial, the defense sought to prevent the State from introducing evidence surrounding the death of Wilson in September 1999 out of fear that the jury might infer that the defendant had played a role in her death. Thus, the court excluded any circumstances surrounding her death and simply instructed the jury that Wilson died in September 1999 from injuries unrelated to those she had received in the shooting.

After hearing arguments of counsel, the trial judge denied admission of the first communication, stating:

"And the reason is because we've gone to great pains to not tell the jury anything about Stacey Wilson's death and there are statements in there that could be construed by the jury leading them to believe that possibly somebody else had something to do with the death or she was having problems with people. And I think that possible prejudice outweighs anything that is gained from that card, and therefore I'm not going to allow it in."

The first letter was dated and served the defendant's purpose of showing the jury that the communication was written by the victim after the shooting. The second letter which was admitted was undated. While there was an envelope with the second communication clearly establishing that it also was written after the date of the shooting, the defendant was unable to establish a proper foundation for its admission.

The defendant argues that the letter written by Wilson to the defendant dated May 30, 1999, should have been admitted at trial. While he attempts to make this exclusion a constitutional issue regarding his right to present a defense, claiming he was denied due process, not all of the defendant's evidence in this case was

excluded. The right to present a defense is not without limits, including statutory rules and case law interpretation of rules of evidence and procedure. *State v. Alexander*, 268 Kan. 610, 616, 1 P.3d 875 (2002) (refusal to admit photographs).

The question presented here is the exclusion of evidence by the trial court. The appropriate standard to be applied is abuse of discretion. The admission of evidence lies within the sound discretion of the trial court. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. *Jenkins*, 272 Kan. at 1378.

The first communication sent by Wilson to the defendant, dated May 30, 1999, provided:

"Hello? 'G' baby whatz upper. I seen this card and just had to get this because it is so true amoung us. Well I hope you be able to come home. I miss your sexy ass. Your smile, and your evil looks. I hope your keeping your head up. do not look back on the bad look forward for the best. And also remeber my love for you is real strong in many ways. 'G' I'm so used in at least seeing you before I go to bed now I have to look at our picture. But 'G' guess what. today I leaves out of mamas house. This bitch name Michelle someone kind to Fonzo tried to rush me. dude I had to push the fat bitch in the car and Dude was with her kept holding her shirt. But Girly wasn't really trying to do some getting down. Because if she wanted to she could of. hit me or whatever. My piece maker I don't have any more. But I'm trying to find one. now. because with this piece lead still in my back next to my liver. I'm not in no place to really be fighting. I go have surgery in like two weeks. But 'G' these bitches got me fucked up. I know I better get out of town before I catch a case. For real! 'G' I hope your staying strong. I know you be sad but it will take a little time. But always remeber. That I love you as if nothing bad had never occur. and this is love no one can take from u and I. and this is true love. Strong love. One bond that we have strive for. it may seem funny or unusual but it's 100% real. Certified as I say. But I keeps it real. 'G' I love you, I can't tell your ass enough. if you can read and tell. I hope I see you soon and very Soon. I love you 'G'."

## The second, undated letter was admitted at trial. It provided:

"What'z upper 'G'! How is my love doing. I know you've been wondering what's been going on with me. Why. come I've not wrote you. But boo I still Love you. I'm always going to Love you, be here for you. I Love You Still. 'G' I've been

stressed, I've never been so harassed by people like this in my whole life. But these muthafuckas got me fucked up four real. But 'G' I'm sorry the kids didn't make it to Lil 'G' birthday party. But KiKi & Whitney was out of town. And Bianca was with B.B. some where. Gordon wish would hurry and make it through things. Because I miss you. Miss you so much I sometimes be thinking I'm going to see you rolling down 18th or Parallel. But hopefully these days will soon be back. 'G' I wish I could of seen you at court. I wish and really wish you and I can see each other. I just remember seeing you at the house. 'G' will you please keep your head up. and please write me back if you need some money. Please Let me know. I'm start paying off my old bill. So I can get my phone back on. Because I would love here from you. I've got on cell phone. # is 908-4613. 913 is the area code. 'G' how in the hell you going to write me and say I mess with REN. Well your wrong. I'm to myself it's been people trying to get at me. But I'm not really trying to be with nobody like that. Trying to get my money back right. I got the 2 door chevy back out Dawynes old Chevy. I paid 2500.00 for it. 'G' will you please remember this I have much love for you. And I really want you home. I've would not of never thought I miss you. But it many of nights I cry. Just because I'm so use of you being here. But I know I've been neglecting you. I'm really sorry. Gordon no one can take your place. So remember this. I Love You. W/ much heart and soul. I love you Boo! But L.L. Joe and Boogie and the rest got me, a bitch like me fucked up 4 real! Write me soon. Just pray for me please. I love you dude. A kiss to you smooches. I just can't tell you enough I still love me some 'G'. Love always, S. Wilson."

We note that the two letters are very similar. The admitted letter clearly demonstrated the nature of Wilson's relationship and affectionate feelings toward the defendant, and the information in the May 30 card would have been cumulative. The defendant's real problem was that he wanted the jury to know that the admitted letter was written after the shooting. The defense, however, failed in its opportunity to lay a proper foundation for the admission of the postmarked envelope.

However, the context of the undated letter suggests that it was written after the shooting as Wilson talks about how much she misses the defendant and how she wishes she could have seen him in court. Moreover, when the undated letter is read in conjunction with the letters written by the defendant to Wilson and admitted into evidence, it becomes clear that the undated letter was being written in response to the defendant's letters.

For example, the defendant's letters dated July 22, 1999, and August 12, 1999, complained that she had not responded to his

letters, that she missed him in court, that he heard she was messing around with "Little Ren," and that he hoped she had fun at "Baby G's" birthday party. The undated letter apologizes for not writing sooner, seeing him in court, or attending "Lil G's" birthday party, and she assured him that she was not messing around with Ren. From this evidence, the jury could have drawn the inference that the undated letter was sent after the shooting.

For these reasons and the reasons advanced by the trial court for exclusion of the dated letter, we conclude that the defendant has failed to establish an abuse of discretion. However, even if we were to conclude that the exclusion was erroneous, we would conclude that no real possibility existed that the jury would have reached a different conclusion in light of the overwhelming evidence of the defendant's guilt at trial. See *Evans*, 275 Kan. at 102.

## 4. Admission of Testimony Bearing on Credibility of State's Eyewitnesses

The standard of review for a trial court's ruling regarding the admission of evidence, subject to exclusionary rules, is whether the trial court abused its discretion. *Wendt v. University of Kansas Med. Center*, 274 Kan. 966, 59 P.3d 325 (2002). Questions which compel a defendant or witness to comment on the credibility of another witness are improper. It is the province of the jury to weigh the credibility of the witnesses. *State v. Dean*, 272 Kan. 429, Syl. ¶ 4, 33 P.3d 225 (2001).

The following exchange took place between defense counsel and Detective Golubski on cross-examination:

"Q. [by defense counsel, Mr. Bath] Okay. Are there any special concerns when you have—like in this situation you have groups of witnesses who know each other and may have had a chance to talk to one another or have contact before you talk to them. Is there any special concerns that you will make before interviewing them?

"A. You definitely want to separate all of them when you did it and—(pause). You would want to make sure that the story hadn't been fabricated or concocted.

"Q. How could you do that?

"A. If each statement or interview parroted each other or mirrored each other, then it's a safe assumption that they have already talked to each other. Because

no two people see the same thing the same. So if someone is telling me the exact same thing, then I'm going to assume that this has been prearranged."

On redirect by the prosecutor, the following relevant exchange took place:

"Q. Detective Golubski, Mr. Bath asked you about taking statements from witnesses and trying to determine whether they had concocted stories and how you do that. And you said that you have had occasion when that has happened. I'm just wondering what sort of characteristics do you look for when somebody is concocting a story and witnesses are colluding together and getting the same story together.

"A. I think it's what I alluded to before. If a story parrots or mirrors each other exactly to the tee, I'm going to say that the story is concocted.

"Q. The fact that everybody happened to see Gordon Martis do the shooting, does that in itself tell you that this is a concocted story?

"A. Not at all.

"Q. Did you see—other than the fact that everybody named him as the shooter, did you see other characteristics within the context of each of those statements that would lead you to believe that these stories were concocted?

"MR. BATH: Objection, invades the province of the jury.

"THE COURT: Overruled.

"A. I'm sorry could you ask it again?

"Q. (By Ms. Lidtke) Other than the fact that they all said Gordon Martis did it, were there other characteristics within the context of each one of these statements that would lead you to believe that they had all gotten together and concocted these stories.

"A. No.

"Q. What was it about each statement that lead you to believe that?

"MR. BATH: Objection, your Honor. May we approach?

"THE COURT: Yes. (The following proceedings were . . . out of the hearing of the jury.)

"MR. BATH: Judge, I believe it's improper to ask him to sort of comment essentially on the truthfulness of each of the individual persons here and their statements. I think the court gave the prosecution wide latitude, but I think that invades the province of the jury to determine if they concocted it or not.

"MS. LIDTKE: I'm not asking for him to comment on the truthfulness of the statements. I'm asking him to describe what parts of these statements were basically inconsistent with an assertion that they were concocted. In other words, what about these statements lead you to believe that they were not colluding.

"THE COURT: Basically you are just asking him set out what variations there are between the statements, which he's already done, I think. Is that what you are saying?

"MS. LIDTKE: No. Actually what I am wanting him to say is there were variations between the statements.
"THE COURT: Okay.
"MR. BATH: Judge, I think we are going to get down this road in reverse. Well, if he makes these statements, then the reverse is true; then they must be truthful statements. I didn't ask if something was concocted or not concocted. I asked if he took precautions. What she is doing with the last question and this one is asking him to be an expert, which he has no foundation for to determine whether a story has been concocted or not. That's the jury's province.
"THE COURT: Well, I think he can—if what she's after—if all she is trying do is say were there differences in these statements, if that's what he's going to say, I think he can answer that."

The prosecutor then asked if there were differences between the statements and the detective replied, "Yes, ma'am." The detective clarified that Fuel had never indicated that she had gotten together with any of the other eyewitnesses prior to making her statement.

The defendant argues the trial court erred in allowing Detective Golubski to vouch for the credibility of the eyewitnesses. Specifically, he objected to the detective's opinion testimony that the eyewitnesses' statements were not concocted. The defendant cites three cases in support of his argument.

First, in *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986), this court held that it was reversible error for the trial court to permit expert witnesses to testify that in their opinion the child was telling the truth and that the defendant committed the acts of molestation with which he was charged. The court reasoned that the witnesses attempted to serve as "human lie detectors" for the child and it was the function of the jury to hear the testimony of the witnesses as to what the child said and then to make a determination of the reliability of the child's statements.

Second, in *State v. Plaskett*, 271 Kan. 995, 1007-09, 1031, 27 P.3d 890 (2001), this court found that the trial court contributed to the cumulative errors by permitting a police detective to testify that he believed the child victim was telling the truth.

Finally, and most analogous to this case, in *Mullins*, 267 Kan. 84, the prosecutor asked a sexual abuse expert whether she thought the child had been coached:

"Q. [Mr. Cahill] Okay. Was there anything about that evaluation that caused you to be concerned that there might be coaching or that Brian in some way would be making this up? Anything inconsistent in his statements regarding that?

"MR. REARDON: Your Honor, could we approach?

"MR. REARDON: I object to this on the basis she can't be a human lie detector as to whether or not the child was telling the truth.

"MR. CAHILL: That's not what I am asking. Asking if anything led her to be concerned about the statements in that area that were inconsistent.

"THE COURT: I will allow it. Go ahead.

"Q. [Mr. Cahill] Go ahead and answer it.

"A. [Phillips] I thought he had been coached?

"Q. [Mr. Cahill] Right. Any indication of that kind of behavior?

"A. [Phillips] No." 267 Kan. at 93.

Based on this exchange, the *Mullins* court recognized:

"There are subtle and not so subtle distinctions in the manner in which the questions leading to a suggestion of truthfulness of the victim are asked. When the trial court overruled defense counsel's objection, Phillips rephrased the question, 'I thought he had been coached?' and answered, 'no.' Technically, as prohibited by *Lash*, [237 Kan. 384 (1985)] and *Jackson*, [239 Kan. 463 (1986),] the question asked of Phillips does not allow the giving of an opinion that B.M. had been sexually assaulted by Mullins or render an opinion that he was telling the truth. This does not, however, mean the question was proper, as it implies truthfulness." 267 Kan. at 96.

The *Mullins* court noted that the theory of the defense was that the child had been induced to bring the subject up and coached in his testimony and the question could have been interpreted by the jury to relate to the activity of the mother which would not have been improper. However, because the question was directed to whether the child was coached, which is another way of asking if he was telling the truth, the court concluded that the line of inquiry was improper but harmless error. 267 Kan. at 96-97.

Although the detective in this case was not providing expert testimony, these cases still provide some guidance in resolving this issue. See *Plaskett*, 271 Kan. at 1007-09. The line of inquiry in this case was similar to that in *Mullins* and was likewise improper. Although defense counsel asked the detective about what precautions had been taken, he did not ask if the eyewitnesses' statements had been concocted; the prosecutor's line of inquiry—whether the detective saw anything specifically in the eyewitnesses' statements

that would make him think their statements were concocted—went beyond general precautions and questioned the specifics of the eyewitnesses' statements. Although the prosecutor did not directly inquire into whether the detective believed the eyewitnesses were telling the truth, these questions, as in *Mullins,* were designed to imply truthfulness by means of demonstrating that the detective believed the eyewitnesses' statements showed no signs of being concocted or fabricated.

Although the questioning was improper, the detective did not expressly testify that the eyewitnesses were telling the truth as in *Jackson* and *Plaskett.* Moreover, this case did not hinge on the credibility of one witness, and it is unlikely that the jury would have given much credit to the detective's opinion when it had the opportunity to listen to the witnesses testify themselves. The detective gave very brief answers to the prosecutor's questions and did not go into specific details regarding the eyewitnesses' versions of events. We conclude that this brief exchange in the middle of extensive trial testimony had little, if any, likelihood of changing the outcome of this case. Thus, the improper questioning amounted to harmless error.

## 5. Exclusion of Potential Jurors

"The public policy of this state is declared to be that jury service is the solemn obligation of all qualified citizens, and that excuses from the discharge of this responsibility should be granted by the judges of the courts of this state only for reasons of compelling personal hardship or because requiring service would be contrary to the public welfare, health or safety; that all litigants entitled to trial by jury shall have the right to juries selected at random from a fair cross section of the community in the district wherein the court convenes; and that all citizens shall have the opportunity to be considered for service on juries in the district courts of Kansas." K.S.A. 43-155.

Persons for whom jury service would cause "extraordinary or compelling personal hardship" may be excused from jury service by the court. K.S.A. 43-159(c). Standard 6(b) of the Standards Relating to Jury Use and Management provides in relevant part: "Eligible persons who are summoned may be excused from jury service by a judge or duly authorized court official only if . . . (ii) their

service would be an extraordinary or compelling personal hardship to them or to members of the public." (2003 Kan. Ct. R. Annot. 93.)

"Whether a person is qualified or competent to sit as a juror is a question for determination by the district court. The district court's ruling will not be disturbed unless it is clearly erroneous or there has been an abuse of discretion."*State v. Hayes*, 270 Kan. 535, 537, 17 P.3d 317 (2001).

Prior to this trial, approximately 1200 potential jurors were summoned. The trial court excused 15 people based on financial hardship/employment requests without requiring them to come to court. The trial judge explained:

"For the record, I excused just about all of those people and I held up a little bit on the employment related excuses or reasons of that nature. And counsel both came in and took a look at what I had. As I counted them later on, I think there were about 30 that were requesting to be excused because of employment reasons. And most of those had a letter from their employer. And counsel indicated I think that you'd just assume they come in. And as I went through them later on, there were a number of those that I excused. Some of them were self-employed people who were on second glance I was convinced would create a hardship. Some of them were people who were not paid during the time they were on jury duty and indicated that it would be a real financial hardship. Some of them owned a one-person business such as a day care or obviously their contention was they simply could not maintain their business if they came in and served on jury duty.

"I was generally taking the approach that most of these folks would be here just for two days, one day to fill out the jury questionnaire and another day to be here all day long for voir dire. It occurred to me that that—that certainly I couldn't make any guarantees about that, and if I'm having them on the—come in and fill out the questionnaire and they're involved in voir dire, then certainly there's a possibility that we're gonna tie 'em up for two or two and a-half-weeks and some of them seemed to have legitimate hardships. So what I'm getting to with all of this is I did release some of the individuals that when counsel was here I was— counsel were here, I was inclined to require to come on in."

Defense counsel objected to the trial court's excusal of the potential jurors solely for economic reasons without requiring them to appear in court for questioning about the veracity of their claims. Counsel argued that the defendant was entitled to a fair cross section of the community which would include people who would

encounter financial difficulty while serving on the jury and that the court's summary excusal of these potential jurors was a violation of his Sixth and Fourteenth Amendment constitutional rights guaranteed in the Unites States Constitution.

On appeal, the defendant argues that K.S.A. 43-159(c) does not state when or how excusals for personal hardship are to be made. Standard 6(d) of the Standards Relating to Small Jury Use and Management provides that the guidelines for determining requests for excusal and deferral should be adopted by the judges of each judicial district. (2003 Kan. Ct. R. Annot. 93.) The defendant relies on *State v. Edwards*, 252 Kan. 860, 852 P.2d 98 (1993), in arguing that the defendant had a Sixth Amendment right to be present and make inquiry of the jurors who were excused. The defendant does not brief the issue of whether the defendant was denied his right to have people with financial difficulties in the jury. As such, the issue is deemed abandoned. See *State v. Hunt*, 275 Kan. 811, 821, 69 P.3d 571 (2003).

In *Edwards*, the defendant argued that his statutory and constitutional rights to be present at all stages of the trial was violated when the trial judge had a private conversation with a prospective juror who had been seated in the jury box and sworn. After this conversation, the judge announced that he was going to excuse the juror because the juror was a doctor who needed to get back to his patients. Defense counsel objected to the excusal on racial grounds but did not object to the fact that neither he nor his counsel was present during the conversation, did not argue that any constitutional rights were violated, and did not request the opportunity to question the doctor before he was excused.

On appeal, this court cited what is now K.S.A. 2002 Supp. 22-3405(1): "The defendant in a felony case shall be present at the arraignment, at every state of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law." The court also noted that the Sixth Amendment to the United States Constitution guarantees a defendant the right to be present at every stage of trial. However, this court concluded that any alleged error was harmless, reasoning:

"Ex parte communications between a juror and the trial judge are improper. See *State v. Bowser*, 252 Kan. 582, Syl. ¶ 1, 847 P.2d 1231 (1993). Enormous bodies of case law have been developed on a defendant's right to be present at all stages of the proceedings, exceptions thereto, and various types of ex parte communications and the legal effects thereof. The facts herein do not warrant an extensive discussion as any error existing herein is so minimal. The communication was not between the judge and an impaneled juror, only a venireman. The discussion had nothing to do with the trial. Had the matter come up before trial, in an ex parte communication, or in voir dire of Dr. Brown, the trial court, in exercising its discretion, could have excused Dr. Brown from service under. K.S.A. 43-159(c) as a person whose presence elsewhere is required for public welfare, health, or safety. The judge advised counsel of the conversation before taking any final action and afforded counsel full opportunity to be heard and to object. Defense counsel did not request the opportunity to inquire of Dr. Brown or raise statutory or constitutional objections in regard to the matter." 252 Kan. at 864.

*Edwards* is distinguishable from this case in that the central question in *Edwards* was whether the ex parte communication between the trial judge and the prospective juror constituted reversible error. Although the court noted that defense counsel did not request the opportunity to question the doctor, as the defense did in this case, the court acknowledged that the judge had the authority under K.S.A. 43-159(c) to excuse the defendant. 252 Kan. at 864. As such, *Edwards* does not decisively resolve this issue.

Although not cited by either party, the question in this case was addressed and resolved in favor of the State in *State v. Baker*, 249 Kan. 431, 819 P.2d 1173 (1991). In *Baker*, the defendant argued for the first time on appeal that he had a constitutional right to be present in person and by counsel when excusals and deferrals from jury service were determined. *Baker* rejected this argument, reasoning:

"The concept that a defendant and his counsel must be present when persons receiving summonses for jury duty are requesting to be excused, but prior to when the trial has commenced, is not even feasible. More often than not, one panel serves many cases in different divisions. Often it is uncertain at this stage which cases will actually be tried during their service. Many courts have primary cases set with various back-up cases listed. It would be impossible to bring all defendants and their counsel together to be present when the decision is to be made on a panel member's request to be excused from jury service. Also, such requests are not determined in a group, but on an individual basis. Such request will probably be in the form of a telephone call or note. No authority has been cited for the

proposition that this is a stage of the proceeding requiring defendant's attendance in person and by counsel.

"We note also that K.S.A. 22-3405(1) provides: 'The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury . . . .' Assembling the jury panel is not the 'impaneling of the jury.' As used in this statute, 'impaneling of the jury' means jury selection. A criminal defendant's statutory and constitutional rights to be present in person and by counsel at trial do not extend to the determination of excuses from jury service sought by individuals who have received summons for jury duty but have not reported for service on a particular case." 249 Kan. at 442.

*Baker* controls. The defendant did not have a Sixth Amendment right to be present in person and by counsel when the trial court excused the 15 prospective jurors based on financial/employment hardship.

## 6. Constitutionality of the Hard 40 Sentence

The defendant contends that the hard 40 sentence for his premeditated first-degree murder conviction must be reversed. See K.S.A. 2002 Supp. 21-4638. He argues that *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), was incorrectly decided and asks this court to overrule it and declare the hard 40 sentencing scheme unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). The defendant contends the *Conley* court's reliance on *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986), was misplaced.

This court has repeatedly upheld *Conley*. See *State v. Boldridge*, 274 Kan. 795, 812, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003); *State v. Papen*, 274 Kan. 149, 165, 50 P.3d 37, *cert. denied* 537 U.S. 1058 (2002); *State v. Albright*, 273 Kan. 811, 826, 46 P.3d 1167, *cert. denied* 537 U.S. 962 (2002); *State v. Boorigie*, 273 Kan. 18, 41-42, 41 P.3d 764 (2002); *State v. Roberson*, 272 Kan. 1143, 1156, 38 P.3d 715, *cert. denied* 537 U.S. 829 (2002); *State v. Verge*, 272 Kan. 501, 518, 34 P.3d 449 (2001); *State v. Sanders*, 272 Kan. 445, 461, 33 P.3d 596 (2001), *cert. denied* 536 U.S. 963 (2002); *State v. Lessley*, 271 Kan. 780, 795, 26 P.3d 620 (2001); *State v. Coleman*, 271 Kan. 733, 741, 26 P.3d 613 (2001); *State v. Lopez*,

271 Kan. 119, 142, 22 P.3d 1040 (2001); *State v. Donesay*, 270 Kan. 720, 726-27, 19 P.3d 779 (2001).

Most recently in *State v. Washington*, 275 Kan. 644, 680, 68 P.3d 134 (2003), this court rejected the defendant's argument that *Conley* should be overruled because the defendant failed to cite any authority postdating *Conley, Apprendi,* or *McMillan* that would convince the court to change its course. The same is true in this case. *Conley* controls.

## 7. Constitutionality of Statute and Jury Instructions Regarding First-Degree Premeditated Murder

The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken it must clearly appear the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. A challenge to the constitutionality of a statute is a question of law and this court has unlimited review. *In re Tax Application of Lietz Constr. Co.*, 273 Kan. 890, 906-07, 47 P.3d 1275 (2002).

"Constitutional attacks based upon vagueness require additional considerations. . . . 'A statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process.' Kansas has long held, however, that a statute will not be declared void for vagueness and uncertainty where it employs words commonly used, previously judicially defined, or having a settled meaning in law. [Citation omitted.]" *City of Wichita v. Hackett*, 275 Kan. 848, 853-54, 69 P.3d 621 (2003) (quoting *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 [1983]).

The defendant argues the statute and jury instructions on first-degree premeditated murder are void for vagueness and violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution because intentional second-degree murder cannot be distinguished from first-degree premeditated murder.

Relevant to this case, murder in the first degree is the killing of a human being committed intentionally and with premeditation. K.S.A. 21-3401(a). In order to establish this charge, the jury was instructed that it must find: "1. That the defendant intentionally killed Alfonzo Moore [or Jerry Seals]; 2. That such killing was done with premeditation; and 3. That this act occurred on the 19th day of May, 1999, in Wyandotte County, Kansas." See PIK Crim. 3d 56.01.

Second-degree murder is the killing of a human being committed intentionally. K.S.A. 2002 Supp. 21-3402(a). In order to establish this charge, the jury was instructed that it must find: "1. That the defendant intentionally killed Alfonzo Moore [or Jerry Seals]; and 2. That this act occurred on or about the 19th day of May, 1999, in Wyandotte County, Kansas." See PIK Crim. 3d 56.03.

In this case, the defense asked the court to instruct the jury that "[p]remeditation means to have thought over the matter beforehand. Premeditation means that there was a design or intent before the act; that is, that the accused planned, contrived and schemed beforehand to kill the victim." The jury was instructed that "[p]remeditation means to have thought over the matter beforehand for any length of time sufficient to form an intent to act" and "intentionally means conduct that is purposeful and willful and not accidental. Intentional includes the terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose.' "

In *State v. Saleem*, 267 Kan. 100, 104-05, 977 P.2d 921 (1999), this court found that the definition of premeditation requested by the defendant ("that there was design or intent before the act; that is, that the accused planned, contrived, and schemed") came from *State v. McGaffin*, 36 Kan. 315, 319, 13 Pac. 560 (1887), and was only of historical interest. This court found that PIK Crim. 3d 56.04(b) (1994 Supp.) correctly states that "premeditation means to have thought over the matter beforehand." 267 Kan. at 105.

Justice Allegrucci concurred with the majority opinion but opined:

"Murder in the first degree is the killing of a human being committed intentionally and with premeditation. K.S.A. 21-3401. Second-degree murder is the killing of a human being committed intentionally. K.S.A. 1998 Supp. 21-3402(a).

By defining 'premeditated' as simply meaning 'to have thought over the matter beforehand,' the majority has effectively converted second-degree murder to first-degree murder. 'Intentionally' is defined as meaning 'conduct that is purposeful and willful and not accidental. Intentional includes the terms "knowing," "willful," "purposeful," and "on purpose." PIK Crim. 3d 56.04(d). How does one intentionally kill another human being without thinking about it beforehand? The jury is also instructed that if it does not find the defendant guilty of first-degree murder, then it should consider the lesser offense of second-degree murder. It is difficult to comprehend how a jury so instructed would ever consider the lesser included offense of second-degree murder.

"As noted in the majority opinion, this court has used words such as 'plan,' 'contrive,' and 'schemed beforehand' to define premeditation. This court has required that a defendant not only think it over beforehand, but also to come to the conclusion that he or she would kill the victim and then do so. The majority, by approving PIK Crim. 3d 56.04(b), has, in my opinion, essentially repealed 21-3402(a)." 267 Kan. at 115. (Allegrucci, J., concurring).

This concurrence has been cited in subsequent cases considering whether the premeditated murder statute and corresponding jury instructions were unconstitutional. The defendant acknowledges that this court has recently considered this issue in *State v. Groschang*, 272 Kan. 652, 36 P.3d 231 (2001), but he contends this case is factually distinguishable because the evidence supported a second-degree murder instruction.

In *Groschang*, the defendant was convicted of premeditated murder based on the following facts: He told his accomplice that it was necessary to kill the victim, he left the house armed with a weapon intending to kill the victim, he drove 45 minutes to the victim's location, he climbed over a fence, he opened a car door, and he fired five shots into the head of the sleeping victim. On appeal, the defendant argued that K.S.A. 21-3401(a), premeditated murder, in conjunction with the instruction that "[p]remeditation means to have thought over the matter beforehand for any length of time sufficient to form an intent to act" effectively "blurred the distinction between first-degree premeditated murder and second-degree intentional murder, making the statute constitutionally vague." 272 Kan. at 668.

As in this case, the defendant relied on Justice Allegrucci's concurrence in *Saleem* in arguing that based on such an instruction there could never be an intentional killing that would not be a

premeditated killing. The *Groschang* court concluded that the premeditated murder statute was not constitutionally vague under the facts of the case because no evidence was presented of second-degree intentional murder and the only evidence was that the defendant committed premeditated murder. 272 Kan. at 670.

In *State v. Jamison*, 269 Kan. 564, 7 P.3d 1204 (2000), the defendant challenged the premeditated murder instruction given in accordance with PIK Crim. 3d 56.04(b) by citing the *Saleem* concurrence regarding the distinction between premeditated, intentional first-degree murder, and intentional second-degree murder. This court responded:

"Consistent with our past decisions, we conclude that the definition of 'premeditation' in PIK Crim. 3d 56.04(b) adequately conveys the concept that 'premeditation' means something more than the instantaneous, intentional act of taking another's life. To have thought the matter over beforehand means to form a design or intent to kill before the act. [Citation omitted.]" *Jamison*, 269 Kan. at 573.

In *State v. Hebert*, 277 Kan. 61 (2004), the defendant appealed the denial of his request to add the following sentence to the jury instruction on premeditation: "A defendant premeditates a crime when he forms a design or intent before the act; that is, when the defendant contrived, planned or schemed beforehand to murder the victim." The trial court instructed the jury in accord with PIK Crim. 3d 56.04(b) (1994 Supp.) stating: "Premeditation means to have thought the matter over beforehand."

On appeal, this court noted its previous decisions in *McGaffin*, *Saleem*, and *Jamison* approving the 1994 PIK definition; however, it also recognized that the 2001 Supplement of PIK Crim. 3d 56.04(b) included the *McGaffin* language in its revised definition of premeditation, stating:

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life. PIK Crim. 3d 56.04(b) (2001 Supp.)." *Hebert*, 277 Kan. at 88.

The *Hebert* court concluded:

"This court has approved PIK Crim. 3d 56.04(b) (1994 Supp.) multiple times, most recently in *Jamison*, [269 Kan. 564 (2000),] *Pabst II*, [273 Kan. 658 (2002),] and *Wimbley*[, 271 Kan. 843 (2001)]. While we approve of the changes in the definition of premeditation by the PIK Committee and urge trial courts to use the new PIK instruction on premeditation, we do not depart from our most recent decision approving the PIK Crim. 3d 56.04(b) (1994 Supp.) definition of premeditation. Thus, we conclude that the trial court in this case did not err in rejecting the defendant's proposed additional instruction." 277 Kan. at 89.

*Jamison* directly addresses the defendant's argument in this case. The definition of premeditation in *Jamison*, as well as in this case, adequately conveys the concept of premeditation: "To have thought the matter over beforehand means to form a design or intent to kill before the act." 269 Kan. at 573 (citing *McGaffin*, 36 Kan. at 319). This distinguishes the crime of premeditated first-degree murder from second-degree intentional murder. As the crimes were distinguishable, it reasonably follows that it would not matter if evidence of second-degree murder was presented at trial.

As in *Groschang*, clear evidence of premeditation was presented in this case: The defendant had previously threatened to kill Wilson and Moore; he had a loaded gun; he watched Wilson and Moore drive past several times; he walked across the street to the victim's car; and he told Wilson, "Bitch, what'd I tell you?" before opening fire on her and the other occupants. According to some of the witnesses, the defendant's gun jammed or he paused, he started to leave, then he looked into the back seat and fired several more shots.

Moreover, it is unlikely that the jury was confused by the difference between premeditated first-degree murder and second-degree intentional murder in this case. The jury distinguished between first-and second-degree murder by convicting the defendant of one count of premeditated murder for Moore (whom he had previously threatened to kill) and one count of second-degree intentional murder of Seals (whom he had no known motive to kill).

For all of the above reasons, we conclude that the first-degree premeditated murder statute and corresponding jury instructions given in this case were not void for vagueness and did not violate the Due Process Clause of the Fourteenth Amendment.

Affirmed.