**AKEEL CODRINGTON, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2009-0002

Supreme Court of the Virgin Islands

July 20, 2012

 

KELE C. ONYEJEKWE, ESQ., Territorial Public Defender, St. Thomas, USVI, *Attorney for Appellant.*

TERRYLN M. SMOCK, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; SWAN, *Associate Justice.*

## OPINION OF THE COURT

(July 20, 2012)

CABRET, *Associate Justice.* Akeel Codrington appeals his convictions for first degree murder, unauthorized use of a firearm during the commission of a first degree murder, and possession of stolen property. For the reasons that follow, we affirm the Superior Court on all grounds.

## I. FACTS AND PROCEDURAL HISTORY

Around noon on October 16, 2007, Carlos Aguilar drove home from work to have lunch. At his house, he discovered that someone had broken in, and called the police and his wife. After the police completed an initial investigation, Mr. Aguilar decided to return to work, but before he got out of his driveway, both he and his wife noticed an unfamiliar red car. As Mrs. Aguilar watched from the driveway, Mr. Aguilar followed the red car, a Mitsubishi Mirage, up a dead end road away from his house and then back down, passing in front of his house. This pursuit ended when the red car, driven by Codrington, crashed into a concrete planter in front of the Sapphire Beach Resort. After the crash, Codrington got out of his vehicle, approached Mr. Aguilar, and shot Mr. Aguilar. Codrington began walking back to his car, but then paused, turned around, calmly walked back to Mr. Aguilar, leaned into the driver's side of Mr. Aguilar's car, and shot Mr. Aguilar again. Two passengers in safari buses,[1] along with the driver of one of the safari buses, witnessed the shooting. After the

---

[1] "A safari [bus or] taxi is an open-sided vehicle" frequently used to provide guided tours of the island. *Farrington v. People*, 55 V.I. 644, 647 n.2 (V.I. 2011). "Passengers are able to easily enter and exit on the left side of the vehicle because there are no doors." *Id.*

incident, police officers responding to the scene found several items stolen from the Aguilars' home in the trunk of the red car driven by Codrington.[2]

As a result of the events of October 16, 2007, police arrested Codrington and charged him with possession of stolen property. After further investigation, police charged Codrington with murder as well. Ultimately, the People brought Codrington to trial on a three count information: first degree murder, in violation of 14 V.I.C. §§ 921 and 922(a), unauthorized use of a firearm during commission of a crime of violence, in violation of 14 V.I.C. § 2253(a), and possession of stolen property, in violation of 14 V.I.C. § 2101(a).

At trial, three eyewitnesses testified for the People. The first of the eyewitnesses, Steve Ramsey, testified that he arrived in St. Thomas aboard a cruise ship and he, his family, and some friends toured the island on an open air safari bus the day of the shooting. He stated that at approximately two o'clock, while on its way to Sapphire Beach, the safari got stuck in traffic in a construction zone. Ramsey said he heard some commotion and saw a silver SUV and a small red car race around the safari. According to Ramsey, the silver SUV proceeded to cut the red car off, causing the red car to crash into a concrete wall. From the safari bus, which was approximately thirty to forty yards away from the crash, Ramsey then saw the drivers of both vehicles get out and begin to argue. Ramsey said that the man who had been driving the red vehicle, who Ramsey later identified as Codrington, had a gun in his hand, and fired a shot at the driver of the SUV moments after the argument began. Ramsey said that after the shot, the driver of the SUV got back into his vehicle. Ramsey then saw Codrington return to the red car, stop, then calmly walk back to the SUV, lean into the driver's side, and fire another shot, this one into the SUV.

At that point the lone passenger of the red car, who had been watching from outside the red car the entire time, had a quick conversation with Codrington. Following this conversation, Codrington and the passenger ran along the road towards the safari, prompting Ramsey and his family to lie on the floor of the safari. Codrington was approximately fifteen to twenty yards away when Ramsey last saw him. After Codrington and the

---

[2] At trial, Keyan Roberts, whose father owned the red Mitsubishi Mirage involved in the incident, testified that he drove the car to work the day of the shootings and then let Codrington use the vehicle for the rest of the day.

179

passenger of the red car passed, the safari eventually drove past the silver SUV, at which point Ramsey saw that the driver of the SUV had been shot. Thereafter, during the investigation of the shooting, Ramsey identified Codrington as the shooter by selecting him from a six person photo array. Ramsey described Codrington as wearing a white t-shirt and short pants on the day of the shooting and as having his hair in either dreadlocks or braids. During the same investigation, Ramsey also described the passenger of the red car as wearing a white t-shirt and short pants.

Bryan Russell also testified that he was in St. Thomas the day of the shooting, vacationing on a cruise ship. Like Ramsey, Russell took a tour of the island on a taxi safari and ended up near Sapphire Beach at the time of the shooting. Russell testified that he saw a man, who he later identified as Codrington, approach from the rear of a red car and fire a silver revolver at a man who had been driving a silver SUV. He stated that after Codrington fired the first shot he took a few steps away from the SUV before he turned around, walked back to the SUV, leaned inside the window, and fired another shot. Russell described Codrington as wearing a white t-shirt and jean shorts with dreadlocks. Russell did not see whether Codrington got out of the red car from the driver's side or the passenger's side and did not see a second person exit the car.

The third eyewitness, Timotheus Ross, a taxi driver/tour guide, testified that he was taking a tour group to Sapphire Beach to go swimming on the day of the shooting.[3] As Ross and his group approached Sapphire, Ross saw a silver SUV chasing a little red car. According to Ross, the red car crashed into a flower bed, prompting the driver of the car to get out of the car with a silver-barreled gun in hand. The driver, who Ross later identified as Codrington, walked over to the SUV and fired a shot inside the SUV. Ross said Codrington then walked back to his car, turned around, walked back to the SUV, and fired a second shot. As Codrington made his second approach, Ross saw Mr. Aguilar move from the driver's seat to the passenger's seat. Ross testified that after firing the second shot, Codrington, dressed in a long white t-shirt and dark pants, walked over to Ross's safari and ordered Ross to step out of the vehicle. Ross refused and Codrington moved on, first by walking to a car behind the safari and

---

[3] Based on the transcript, it appears that Ross drove the safari bus with Ramsey on it, and that the other eyewitness, Russell, rode on a different safari.

attempting to get into that vehicle, and after that failed, by walking further down the road out of Ross's sight. After Codrington left, Ross went to the silver car to check on Mr. Aguilar. Ross testified that he saw Mr. Aguilar holding his belly and blood "coming through his fingers." (J.A. vol. II, 35-36.) During the police investigation into the shooting, Ross identified Codrington as the shooter by picking him out of a six or seven person photo array. During the investigation Ross also described a passenger from the red car as wearing a white t-shirt and dark colored pants.

In addition to the three eyewitnesses, the People called a number of other witnesses to testify at the trial, including Officer Lauren Battiste, Crime Scene Technician Sharissa Brathwaite, Mrs. Aguilar, and Detective Albion George. Officer Battiste testified that, on the day of the shooting, she responded to a burglary complaint made by Mr. Aguilar. According to Battiste, when she arrived the Aguilars' home had been ransacked. Battiste spoke with Mr. Aguilar and his wife, who told her that a forty-inch television, a twenty-inch television, a digital phone, and some jewelry were missing. After completing her initial investigation, Battiste requested a forensic unit follow up with the Aguilars and left the home.

Crime Scene Technician Brathwaite testified that on the day of the shooting she reported to the crime scenes to collect evidence. At the scene of the shooting, Brathwaite took pictures of the red Mitsubishi Mirage, including the inside of the trunk, which contained a television set and a cordless phone, among other items.

Mrs. Aguilar testified that, on the day of the shooting, she left work to return to her home after receiving a phone call from her husband that their home had been burglarized. Mrs. Aguilar said that she and her husband met with the police regarding the burglary, and after the police left she saw her husband follow a suspicious looking red car away from their house. Shortly after Mrs. Aguilar lost sight of the vehicles, she heard a "pop" sound. (J.A. vol. I, 155.) Worried about her husband, Mrs. Aguilar said she called him and learned that he had been shot not too far from their house. Mrs. Aguilar testified that she then drove to her husband and found him bloodied in the passenger's side of his car with a hole in his shirt. According to Mrs. Aguilar, the red car she saw earlier had crashed into a planter and there was no one in it. An ambulance took both Mr. and

Mrs. Aguilar to the hospital, where Mr. Aguilar died nine days later.[4] In addition to recounting the events of the shooting, Mrs. Aguilar confirmed that the television set and cordless phone the police found in the trunk of the red Mitsubishi Mirage were items stolen from her house.

Detective George testified that he interviewed Codrington the day after the shooting occurred. In that interview, Codrington admitted that he was driving the red Mirage at the time of the accident. Codrington told George that before the accident, he picked up a hitchhiker who offered Codrington thirty dollars if he would give him a ride "to the dock." (J.A. vol. II, 103, 106.) The passenger allegedly had a garbage bag with him containing a television set and a "small component,"[5] which Codrington helped put in the trunk. (J.A. vol. II, 106.) With this unidentified passenger in the car, Codrington continued driving until he noticed a silver four-door vehicle approaching from behind at a high speed. According to Codrington, the vehicle collided with the red car, causing Codrington to crash into a wall. Following the crash, Codrington said he got out of the vehicle, heard gunshots, and took off running. Codrington admitted that on the day of the shooting he was wearing a white t-shirt and "blue jean pants." (J.A. vol. II, 106.)

In his defense, Codrington called four witnesses in an effort to implicate the passenger of the red car as the true shooter. Codrington first called Denvil Blash. Blash testified that he was working near Sapphire Beach on the day of the shooting. Blash said he saw a red vehicle crash into a wall, heard gunshots, and then ran towards the scene of the accident. Blash further testified that he spoke with Deputy U.S. Marshal Paul Nielsen after the incident, but did not remember what he told Deputy Nielsen. Specifically, Blash denied telling Nielsen that he saw two black males get out of the red car and that the passenger went over to the SUV and fired two shots. Codrington then called Deputy Nielsen to testify as to his conversation with Blash. Nielsen testified that Blash did in fact tell him that he saw two black males exit from the red car after it crashed and saw the passenger of the red car fire two shots at the driver of the SUV.

---

[4] Dr. Francisco J. Landron, the Medical Examiner for the Virgin Islands, testified that Mr. Aguilar died as a result of two gunshot wounds.

[5] After the incident, the police searched the red car and found a television set, but did not find any garbage bags.

Codrington also called Almando Van Holten to testify. Like Blash, Van Holten was working the day of the shooting and saw the red car crash into a wall. Van Holten testified that he heard two gunshots, but did not see the shooter. Van Holten denied telling law enforcement agents that he saw a black male exit the passenger's side door of the red car with a gun in his hand. Codrington then called Officer Warrington Tyson to testify to his conversation with Van Holten. Tyson, along with another detective, interviewed Van Holten about the shooting. According to Tyson, Van Holten told Tyson that he saw the red vehicle crash, saw a black male exit the vehicle from the passenger's side door, and then heard two gunshots. At that point, Van Holten saw the individual who exited the passenger's side door with a gun in his hand, pointed at a silver SUV.

■ Based on the evidence presented, the jury found Codrington guilty on all counts, and the Superior Court sentenced him to life in prison without the possibility of parole for first degree murder, fifteen years incarceration for the firearms charge, and five years for possession of stolen property. The Superior Court entered its judgment on November 24, 2008, and Codrington filed his notice of appeal on November 17, 2008. Because a notice of appeal filed prior to the entry of judgment is treated as having been filed on the same day as the judgment, this appeal was timely filed. *See* V.I.S.CT.R. 5(b).

## II. JURISDICTION

■ We have jurisdiction over this criminal appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." *See, e.g., Browne v. People*, 56 V.I. 207, 216 (V.I. 2012) (explaining that in a criminal case, a written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication constitutes a final judgment for the purposes of 4 V.I.C. § 32(a)); *Melendez v. People*, 56 V.I. 244, 251 (V.I. 2012) (same).

## III. DISCUSSION

Codrington argues that the following eight errors require reversal of his conviction: (1) the information improperly charged and the trial court improperly instructed the jury on the elements of first degree murder; (2) title 14, section 922(a) of the Virgin Islands Code is unconstitutionally

vague; (3) the People failed to present sufficient evidence that he committed first degree murder; (4) the trial court failed to conduct an inquiry into his claims of pretrial ineffective assistance of counsel; (5) the trial court failed to instruct the jury that involuntary manslaughter is a lesser included offense of first degree murder; (6) he was charged by information without submitting the charges to a grand jury; (7) the trial court violated the Eighth Amendment's ban on cruel and unusual punishment by sentencing him to life without parole; and (8) the People presented insufficient evidence that he possessed stolen property.

### 1. The information properly notified Codrington of the elements of first degree murder and the Superior Court properly instructed the jury on the elements of first degree murder.

Codrington argues that his right to due process, right to notice of the charges against him, and right to a jury trial, were violated because neither the charging information nor the jury instructions contained all the elements of first degree murder. Specifically, Codrington argues that, to commit first degree murder in the Virgin Islands, an individual must not only unlawfully kill a human being with malice aforethought, but also that the killing must be done by poison, lying in wait, torture, or detonation of a bomb, or be similar in kind to a killing by poison, lying in wait, torture, or detonation of a bomb. Because the information failed to mention this "additional" element, that is, whether Codrington committed a willful, deliberate, and premeditated killing in a manner similar to a killing by poison, lying in wait, torture, or detonation of a bomb and because the Superior Court did not instruct the jury on this "element," Codrington argues that his conviction must be vacated. Because Codrington did not raise this issue to the Superior Court, we review his claim only for plain error. *See Hightree v. People*, 55 V.I. 947, 950 (V.I. 2011).

To determine whether the information or the jury instructions improperly omitted one of the elements of first degree murder, we begin by analyzing the statute governing first degree murder in the Virgin Islands, namely, 14 V.I.C. § 922. Title 14, section 922(a) states "All murder which . . . is perpetrated by means of poison, lying in wait, torture, detonation of a bomb or by any other kind of willful, deliberate and premeditated killing . . . is murder in the first degree." Recently, we explained that murder in the first degree that does not involve poison, lying in wait, torture, or detonation of a bomb instead requires that the

184

People prove the defendant (1) unlawfully killed another, (2) with malice aforethought, and (3) in a willful, deliberate, and premeditated manner. *See Brown v. People*, 54 V.I. 496, 505 (V.I. 2011). *See also Nicholas v. People*, 56 V.I. 718, 731 (V.I. 2012). Both the information and the jury instruction at the trial set out those three elements. Nevertheless, Codrington urges us to adopt an additional element — that the jury must find that the means of perpetrating the murder were similar to poison, lying in wait, torture, or detonation of a bomb — by interpreting 14 V.I.C. § 922 applying the canon of statutory interpretation known as *ejusdem generis*.[6] In making this argument Codrington fails to consider the first principle of statutory interpretation — "that when the statutory language is plain and unambiguous, no further interpretation is required." *People v. Baxter*, 49 V.I. 384, 388 (V.I. 2008) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)). Accordingly, when the language of a statute is plain and unambiguous, a court does not look beyond the language of the statute in interpreting the statute's meaning. *Id.* at 388-89 (citing *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992)) (stating "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, the first canon is also the last: judicial inquiry is complete."). Moreover, " '[t]he rule of ejusdem generis . . . is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty,' " and " 'it may not be used to defeat the obvious purpose of legislation.' " *United States v. Powell*, 423 U.S. 87, 91, 96 S. Ct. 316, 46 L. Ed. 2d 228 (1975) (quoting *Gooch v. United States*, 297 U.S. 124, 128, 56 S. Ct. 395, 80 L. Ed. 522 (1936)).

██ ██ Because the language of 14 V.I.C. § 922 is unambiguous, no further interpretation is needed and we need not apply *ejusdem generis* to interpret the statute. Indeed, the plain language of Section 922(a)(1) defines four specific methods of killing which are first degree homicide (poison, lying in wait, torture, and bombs), then provides that other killings, regardless of method, are also first degree murder when committed with a specific mindset. Because the statute lists four examples

---

[6] *Ejusdem generis* is "[a] canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." BLACK'S LAW DICTIONARY, 594 (9th ed. 2009).

as specific ways to commit first degree murder and then states that "any other kind of willful, deliberate and premeditated" murder is also first degree murder, a murder accomplished through one of the four enumerated methods does not require a willful, deliberate, and premeditated showing. *See, e.g., People v. D'Arcy*, 48 Cal. 4th 257, 106 Cal. Rptr. 3d 459, 226 P.3d 949, 975 (2010) ("it is unnecessary in torture-murder to also find that the killing itself was wil[l]ful, deliberate, and premeditated.") (internal quotation marks and citations omitted); *State v. Moore*, 335 N.C. 567, 440 S.E.2d 797, 818 (1994) ("When a murder is committed by means of poison, premeditation and deliberation are not elements of the crime of first-degree murder and premeditation and deliberation are hence irrelevant."); *State v. Davis*, 205 W. Va. 569, 519 S.E.2d 852, 867 (1999) (finding "that specific intent to kill, premeditation and deliberation are not elements of the crime of first degree murder perpetrated by means of poison."). However, for a killing to be first degree murder when it falls outside the four specific examples, the statute plainly requires that it be done willfully, deliberately, and with premeditation. *See, e.g., Brown v. People*, 54 V.I. 496, 506-08 (V.I. 2010) (finding first degree murder accomplished with knife when killing was willful, deliberate, and premeditated); *Richardson v. Gov't of the V.I.*, 55 V.I. 1193, 1216 (D.V.I. App. Div. 2011) (finding first degree murder accomplished with gun when the killing was willful, deliberate, and premeditated). It is clear from a simple reading of the plain language of section 922(a)(1) that the Legislature intended to define all murder accomplished by the four enumerated examples — poison, detonation of a bomb, lying in wait, and torture — and any other murder, regardless of how the murder was accomplished, so long as the murder was willful, deliberate, and premeditated as first degree murder. We note that other appellate courts, when faced with the same argument, have also refused to apply *ejusdem generis* to first degree murder statutes. *See People v. Vinunzo*, 212 Mich. 472, 180 N.W. 502, 503 (1920); *State v. Randolph*, 49 Nev. 241, 242 P. 697, 698-99 (1926). Accordingly, we conclude that, based on the plain language of 14 V.I.C. § 922(a)(1), both the information charging Codrington and the Superior Court's final jury instructions properly stated the elements of first degree murder.

186

## 2. Title 14, section 922 of the Virgin Islands Code is not unconstitutionally vague.

Codrington also argues that the terms "willful, deliberate, and premeditated" in 14 V.I.C. § 922(a)(1), are unconstitutionally vague. (Appellant's Br. 23.) Specifically, Codrington argues that because "willful" can take any amount of time, "deliberate" can take a second, and "premeditate" can also take a second, nothing distinguishes the terms. (Appellant's Br. 23.) Accordingly, Codrington argues that "the statute is unconstitutionally vague on its face, as applied or both because it does not warn anyone of conduct which will be considered 'willful[,]' 'deliberate[,]' or 'premeditated.' "[7] (Appellant's Br. 23.) Once again, Codrington failed to raise this issue to the Superior Court. Therefore, we review his claim for plain error only. *See Hightree*, 55 V.I. at 950.

■ "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1986). Therefore, a statute "is unconstitutionally vague if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.' "[8] *LeBlanc v. People*, 56 V.I. 536, 541 (V.I. 2012) (quoting *United States v. Williams*, 553 U.S. 285, 304, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008)).

---

[7] Codrington also argues that the statute's lack of clarity deprived him of his right to effective assistance of counsel. (Appellant's Br. 23.) Because we conclude that the statute is not unconstitutionally vague, this argument also fails.

[8] Outside the context of a challenge to an individual's First Amendment freedoms, when a defendant challenges a criminal statute as unconstitutionally vague, we generally analyze the specific allegations against the defendant and "determine whether th[e] statute is vague as applied to the facts of the particular charge against [the defendant]." *LeBlanc v. People*, 56 V.I. 536, 541 (V.I. 2012). If the defendant's conduct was clearly proscribed by the statute, he lacks standing and may not challenge the statute as facially vague. *Id.* However, as this Court recently explained, in this jurisdiction the standing requirement is a claims processing rule subject to waiver. *See Benjamin v. AIG Ins. Co. of P.R.*, 56 V.I. 558, 564-565 (V.I. 2012). Accordingly, because the People failed to argue that Codrington lacked standing to challenge 14 V.I.C. § 922 as unconstitutionally vague on its face, the People waived that argument and we will consider Codrington's facial challenge.

187

■ Codrington presents no authority to support his vagueness argument, and fails to establish that a person of ordinary intelligence does not have a reasonable opportunity to know what is prohibited by 14 V.I.C. § 922 or that the statute encourages arbitrary or discriminatory enforcement. Codrington simply argues that because a person can commit a premeditated, willful, and deliberate killing in a matter of seconds, ordinary people do not know what conduct those words prohibit. (Appellant's Br. 23.) However, courts from other jurisdictions addressing similar arguments have held that similar first degree murder statutes were not void for vagueness. *See Sperry v. McKune*, 445 F.3d 1268, 1272-73 (10th Cir. 2006) (holding that a first degree murder statute requiring premeditation was not unconstitutionally vague); *State v. Martis*, 277 Kan. 267, 83 P.3d 1216, 1237-39 (2004) (same). Furthermore, the Third Circuit defined these terms long ago in *Government of the Virgin Islands v. Lake*, 362 F.2d 770, 776, 5 V.I. 594 (3d Cir. 1966), and this Court has expressly adopted those definitions. *See Brown*, 54 V.I. at 507 (drawing on *Government of the V.I. v. Martinez*, 780 F.2d 302, 305 (3d Cir. 1985) which in turn drew on the definitions from *Lake* to explain that " '[t]o premeditate a killing is to conceive the design or plan to kill' " and that " '[a] deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood . . . .' " (quoting *Gov't of the V.I. v. Martinez*, 780 F.2d 302, 305 (3d Cir. 1985))). *See also Nicholas*, 56 V.I. at 731. Moreover, the simplicity and straightforwardness of the meaning of these terms makes it clear that ordinary people understand what conduct these words are designed to prevent. *See People v. Ledesma*, 39 Cal. 4th 641, 47 Cal. Rptr. 3d 326, 140 P.3d 657, 725 (2006) (noting that the words "willful, deliberate, and premeditated" in a murder statute are not unconstitutionally vague because they "can be readily understood and applied"). Because the terms "willful, deliberate, and premeditated" have long since been defined in this jurisdiction and because, even without that definition, ordinary people can readily understand and apply the terms, 14 V.I.C. § 922 is not void for vagueness. Therefore, the Superior Court did not commit plain error by failing to find the statute unconstitutional.[9]

---

[9] Moreover, as applied to Codrington, there is no question that a person of ordinary intelligence knows that the language in 14 V.I.C. § 922 prohibits someone from walking over to the driver of a vehicle, shooting the driver once, taking a few steps away from the vehicle, then

### 3. The People presented sufficient evidence to convict Codrington of first degree murder.

Codrington also argues that there was insufficient evidence to support a finding that he acted willfully, deliberately, and with premeditation. Specifically, Codrington argues that there were no facts in the record that show he planned a killing, there were no facts in the record from which the jury could infer a motive for him to kill Mr. Aguilar, and there were no facts in the record "about the nature of the killing [that are] so particular and exacting that [he] must have intentionally killed according to a 'preconceived design.' " (Appellant's Br. 25-26.) Following the prosecution's case and at the end of trial, Codrington moved for a judgment of acquittal. The Superior Court denied both of those motions. Our review of these denials is plenary, and we apply the same test as the trial court. *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009). "We will affirm a conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. People*, 51 V.I. 396, 398 (V.I. 2009).

At trial, the People presented three eyewitnesses to support the first degree murder charge. All three eyewitnesses testified that Codrington left his car, walked toward Mr. Aguilar with a gun in hand, and shot Mr. Aguilar once. After firing the first shot, all three witnesses testified that Codrington walked away from Mr. Aguilar, paused, and then approached Mr. Aguilar a second time. Steve Ramsey described Codrington's second approach as calm. Timotheus Ross testified that Mr. Aguilar was trying to get away from Codrington by crawling from the driver's side of his SUV to the passenger's side as Codrington walked toward him on the second approach. The witnesses all stated that Codrington leaned into the window of Mr. Aguilar's SUV, and then fired a second shot.

We have previously described the mindset necessary to establish first degree murder:

> [T]o premeditate a killing is to conceive the design or plan to kill. A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden

---

turning around, walking back to the vehicle, leaning inside the vehicle, and shooting the driver a second time.

passion engendered by just cause of provocation. It is not required, however, that the accused shall have brooded over his plan to kill or entertained it for any considerable period of time. Although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill.

*Brown*, 54 V.I. at 507 (quoting *Martinez*, 780 F.2d at 305). A rational jury could infer, based on the testimony, that Codrington formed a plan to kill Mr. Aguilar while walking from his car to Mr. Aguilar, prior to firing the first shot. Alternatively, a rational jury could infer, based on the testimony, that following the first shot, while walking away from Mr. Aguilar, Codrington deliberated, considered the consequences of his actions up to that point, and conceived the design to kill Mr. Aguilar. This inference is particularly compelling, given that Codrington suddenly stopped walking away from his wounded victim, turned around, walked back to Mr. Aguilar, and willfully fired a second shot.

█ In a similar case in California, a defendant, following a car chase, shot his pursuer once, then exited his car, stood over his victim, and calmly shot him a second time. The California Supreme Court found that "[t]he manner of the shooting — approaching a prone victim, stopping over him, and then aiming — shows a calculated design to ensure death rather than an unconsidered explosion of violence." *People v. Brady*, 50 Cal. 4th 547, 113 Cal. Rptr. 3d 458, 236 P.3d 312, 328 (2010) (internal quotation marks and citation omitted). From Codrington's behavior in the present case, a rational jury could likewise infer a calculated design to ensure Mr. Aguilar's death. Therefore, the Superior Court did not err by determining that there was sufficient evidence to support the jury's finding of willfulness, deliberation, and premeditation.

### 4. Codrington did not establish the elements necessary for an ineffective assistance of counsel claim.

Codrington next argues that the Superior Court erred by conducting an inadequate inquiry into his claims of pretrial ineffective assistance of counsel. Codrington does not argue why or how his counsel provided him with ineffective assistance, and instead claims that, because he wrote a letter to the Superior Court four months prior to his trial alleging ineffective assistance of counsel, the Superior Court should have "develop[ed] a record of [his] claim of ineffectiveness." (Appellant's Br.

190

26, 29.) In his letter, Codrington asked the court to appoint a new attorney to represent him because, allegedly, in the five months his attorney represented Codrington prior to his complaint they only met twice, he called his attorney's office numerous times but never spoke with her, and his attorney failed to file several motions Codrington asked her to file, including a motion to suppress his statement.[10] (J.A. vol. IV, Ltr. to Judge Carroll.) The Superior Court considered the letter requesting the appointment of new counsel and denied it, reasoning that Codrington was attempting to shop for a new attorney and that his attorney was "doing a very good job representing [Codrington]."[11] (J.A. vol. IV, May 29, 2008 Order, 1-2; Suppression Hr'g Tr. 129.)

■ " 'Ordinarily, a claim of ineffective assistance of trial counsel is not appropriately reviewed for the first time on direct appeal . . . because the necessary facts about counsel's representation of the defendant have not been developed.' " *Stanislas v. People*, 55 V.I. 485, 491 (V.I. 2011) (quoting *Rivera v. Gov't of the V.I.*, 981 F. Supp. 893, 900, 37 V.I. 68 (D.V.I. App. Div. 1997)). *See also United States v. McLaughlin*, 386 F.3d 547, 555 (3d Cir. 2004) (stating that "Sixth Amendment ineffective assistance of counsel claims, under *Strickland* . . . are generally not entertained on a direct appeal."); "However, when an adequate record exists, the claim may be reviewed on direct appeal." *Rivera*, 981 F. Supp. at 900; *see also Corraspe v. People*, 53 V.I. 470, 486 (V.I. 2010). In the present case, Codrington has provided the entire transcript of the trial, as well as a transcript from a pretrial hearing. Because Codrington challenges only the court's failure to conduct an inquiry into his pretrial claims of ineffective assistance of counsel and an adequate record of the

---

[10] At sentencing, the trial court noted that, prior to trial, Codrington met with counsel three times simply to discuss a plea bargain. (J.A. vol. III, 264).

[11] Specifically, the Superior Court addressed Codrington's concerns during a pretrial hearing by stating:

> Mr. Codrington, I am not going to assign another Attorney for you. I have assigned a very competent Attorney to represent you and I am not going to change that assignment. In any event, I don't accept — ordinarily, I don't accept motions from individuals who are being represented. However, because of the nature of the motion, I have read it. Usually, I would refer motions back to your Attorney, but since you are asking that your Attorney be relieved, I will consider it and I have denied it, sir. I will not allow you to shop. Basically, what you are asking to do is to shop around for an Attorney. I think that Attorney Todman is doing a very good job representing you.

(Suppression Hr'g Tr. 129, May 28, 2008.)

191

■■■ ■■■■■■■ ■■■

alleged pretrial deficiencies exists, we will review Codrington's claim on direct appeal.

When, as here, "a defendant asserts a pretrial claim of ineffective assistance of counsel, 'the trial court has a constitutional duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations.'" *Aiken v. United States*, 956 A.2d 33, 38 (D.C. 2008) (quoting *Monroe v. United States*, 389 A.2d 811, 820 (D.C. 1978)). This duty requires the trial court to undertake more than a mere *pro forma* inquiry. *Id.* The court must conduct "'specific and thorough'" questioning sufficient "'to elucidate counsel's degree of compliance' with the applicable 'criteria of professional competence.'" *Id.* (quoting *Farrell v. United States*, 391 A.2d 755, 760-61 (D.C. 1978)). However, we review a trial court's decision whether to grant new counsel only for an abuse of discretion. *Id.* at 38-39. Moreover, even if a trial court fails to make a proper inquiry before ruling on an indigent defendant's application for new counsel based on allegations that the defendant's counsel is providing ineffective assistance, we will nevertheless affirm that defendant's conviction if the error is harmless beyond a reasonable doubt. *Monroe*, 389 A.2d at 823. A trial court's failure to inquire into a defendant's complaints regarding his counsel is harmless beyond a reasonable doubt if we can discern no basis on which the questioned attorney's conduct was constitutionally defective. *Id.* *See also Commonwealth v. Moran*, 388 Mass. 655, 448 N.E.2d 362, 364-65 (1983) (finding that trial court erred by failing to conduct inquiry into reasons defendant sought to replace his appointed counsel, but nevertheless affirming the defendant's convictions because the defendant was not prejudiced by the error in that he lacked a valid reason to discharge the attorney).

It is undisputed that the trial court did not inquire into Codrington's pretrial complaints about his attorney. In failing to do so, the trial court erred. To determine whether the trial court's error was harmless, we must be convinced beyond a reasonable doubt that Codrington's allegations about his counsel's pretrial performance would not have established that the representation fell below the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) had the Superior Court made the required inquiry. Under *Strickland*, an attorney's representation is deficient if

192

specific "acts or omissions of counsel [were not] the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

In his letter to the Superior Court, Codrington's first complaint was that his lawyer did not move to suppress his statement given to police or file other motions. Less than thirty days after Codrington sent his letter to the judge, a full evidentiary hearing was held on Codrington's motion to suppress the statement he gave to police. Before Codrington wrote his letter, his trial counsel had filed at least six motions, including motions to exclude autopsy photos, motions for unredacted witness statements, motions to view the incident scene, and motions to suppress witness identification. Accordingly, Codrington's complaint that his attorney did not file motions or attempt to suppress his statement was without merit and we are convinced beyond a reasonable doubt that the Superior Court would have found as much had it inquired into Codrington's allegations.

■ Codrington's other complaint was that his attorney did not visit or meet with him often enough. In *United States v. Olson*, 846 F.2d 1103, 1108 (7th Cir. 1988), the defendant asserted that his lawyer only spoke with him twice before trial, and was only able to have a single telephone conference. The Seventh Circuit stated "we know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel [and] an experienced attorney can get more out of one interview with a client than a neophyte lawyer." *Id.* (citing *United States ex rel. Kleba v. McGinnis*, 796 F.2d 947, 954 (7th Cir. 1986)). Although *Olson* involved a post-trial claim for ineffective assistance of counsel as opposed to a pretrial claim, we nevertheless concur that a defendant is not entitled to any specific amount of minimum communication between himself and his lawyer. A criminal defendant is entitled only to a competent attorney who exercises reasonable professional judgment in preparing for trial and making strategic decisions. The record demonstrates that Codrington's counsel met with him at least two times well in advance of his trial and then later at least another three times to discuss a potential plea agreement. The record contains no indication or allegation that Codrington's attorney was unprepared for trial. Accordingly, Codrington's complaint that he received ineffective assistance of counsel because of the lack of communication between himself and his counsel is also without merit. Consequently, because we are convinced beyond a reasonable doubt that the Superior Court would not have appointed

Codrington new counsel even if it made a sufficient inquiry into Codrington's complaints, the Superior Court's error in failing to make such an inquiry was harmless. *See Monroe*, 389 A.2d at 823.

## 5. The Superior Court did not err by failing to give an involuntary manslaughter instruction.

Codrington next argues that the Superior Court erred by not instructing the jury that involuntary manslaughter is a lesser included offense of first degree murder. During trial, Codrington never requested that a lesser included offense instruction be given to the jury. Because the alleged error was not raised at trial, we may review only for plain error. *See Hightree*, 55 V.I. at 950.

Although manslaughter is a lesser included offense of murder, it is only appropriate for a trial court to give the jury an instruction when the evidence warrants that instruction. As the United States Supreme Court has previously explained, a "defendant is entitled to an instruction on a lesser included offense [only] if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble v. United States*, 412 U.S. 205, 208, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973). *See also Gov't of the V.I. v. Carmona*, 422 F.2d 95, 101, 7 V.I. 441 (3d Cir. 1970) (holding that a trial court did not err when it failed to instruct on a lesser included offense, because there was no evidence of one of the elements of the alleged lesser included offense); *People v. Mendoza*, 468 Mich. 527, 664 N.W.2d 685, 692-93 (2003) (explaining that voluntary and involuntary manslaughter are lesser-included offenses of murder, and an instruction on both offenses must be given if a rational view of the evidence supports the instruction).

Involuntary manslaughter is the unlawful killing of a human being without malice aforethought, done in one of three ways: (1) in the commission of an unlawful act, not amounting to a felony, (2) in the culpable omission of some legal duty, or (3) in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. 14 V.I.C. § 924.

■■■ Based on the evidence presented at trial, a jury could not have rationally found Codrington guilty of involuntary manslaughter. Although Codrington does not specify under which of the three categories of involuntary manslaughter he could have been convicted, the evidence was

194

insufficient to warrant an instruction on any of the three categories of involuntary manslaughter. Indeed, there is no conceivable argument that Codrington killed Mr. Aguilar either by culpable omission or through a lawful act (categories two and three). The only possible argument is that Codrington killed Mr. Aguilar during the commission of an unlawful act, not amounting to a felony. This argument is likewise without merit, as a jury would have to find that Codrington was not committing a felony when he twice discharged his unlicensed gun at Mr. Aguilar. *See Gov't of the V.I. v. Knight*, 989 F.2d 619, 632, 28 V.I. 249 (3d Cir. 1993). Under Virgin Islands law, the possession of an unlicensed firearm, with nothing more, is a felony. 14 V.I.C. § 2253; 14 V.I.C. § 2. Therefore, it is impossible that Codrington's behavior could have been found, by a rational jury, to have been involuntary manslaughter. Accordingly, the Superior Court did not err by failing to give an involuntary manslaughter instruction.

### 6. The Superior Court did not err by allowing Codrington to be pros-ecuted by information, rather than grand jury indictment.

Codrington's fifth argument is that he was denied a fundamental right to a grand jury investigation of the charges against him. This argument is raised for the first time on appeal, and therefore it must be reviewed for plain error. *See Hightree*, 55 V.I. at 950.

 The Fifth Amendment prohibition that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury" does not apply to the unincorporated Territory of the Virgin Islands. *Bigby v. Gov't of the V.I.*, 125 F. Supp. 2d 709, 715-716 (D.V.I. App. Div. 2000); *see also Gov't of the V.I. v. Dowling*, 633 F.2d 660, 667, 17 V.I. 623 (3d Cir. 1980); *United States v. Ntreh*, 279 F.3d 255, 256 (3d Cir. 2002) ("[R]esidents of the Virgin Islands have no constitutional right to indictment by a grand jury."); *Rivera v. Gov't of the V.I.*, 375 F.2d 988, 991, 6 V.I. 155 (3d Cir. 1967) ("[T]he right of presentment by grand jury is merely a remedial right which is not among the fundamental rights which Congress in legislating for a territory not incorporated into the United States, such as the Virgin Islands, must secure to its inhabitants."). The Revised Organic Act provides that "all offenses against the laws of the Virgin Islands which are prosecuted . . . in the courts established by local law shall continue to be prosecuted by information, except such as may be required

195

by local law to be prosecuted by indictment by grand jury." Revised Organic Act § 3, 48 U.S.C. § 1561. Codrington was prosecuted for violations of the laws of the Virgin Islands, in the Superior Court, which was established by local law. Therefore, he may be prosecuted by information unless a local law requires him to be prosecuted by grand jury. No local law exists which requires first degree murder, or any other charge against Codrington, to be prosecuted by grand jury indictment. Therefore, the Superior Court did not err by allowing Codrington to be prosecuted by information, rather than grand jury indictment.

### 7. Codrington's sentence does not violate the Eighth Amendment.

Codrington next argues that 14 V.I.C. § 922 is unconstitutional because it imposes a life sentence without regard to the age of the offender. This argument is raised for the first time on appeal, and therefore may only be reviewed for plain error. *See Beaupierre*, 55 V.I. 623, 630 (V.I. 2011). In making this argument, Codrington relies on a recent United States Supreme Court decision which held that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Graham v. Florida*, 560 U.S. ___, ___, 130 S. Ct. 2011, 2034, 176 L. Ed. 2d 825 (2010). This argument is utterly without merit for two reasons. First, Codrington was, at the time of the offense, not a juvenile. Under Virgin Islands law, "any person 18 years of age or older is an adult." 5 V.I.C. § 2502(4). Codrington admits that at the time of the offense, he was nineteen years old. (Appellant's Br. 13.) Second, *Graham* expressly limits itself to juvenile offenders *who did not commit homicide. Graham*, 130 S. Ct. at 2034. Codrington committed first degree murder. Therefore, *Graham* does not apply to this case.

However, *Graham* does offer guidance in how we should evaluate an Eighth Amendment claim of cruel and unusual punishment. When a party facially challenges a sentencing practice under the Eighth Amendment, courts should consider the " 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." *Graham*, 130 S. Ct. at 2022 (quoting *Roper v. Simmons*, 543 U.S. 551, 563, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)). If there is such a consensus, the Court "must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Id.* (citation omitted). The sentencing practice at issue here

is a life sentence without parole for an adult convicted of first degree murder. Codrington has presented no evidence regarding a national consensus against sentencing an adult convicted of first degree murder to life imprisonment. Indeed, while not authorized in the Virgin Islands, the national consensus in the United States recognizes the death penalty as an appropriate punishment for first degree murder. As there is no evidence that a life sentence for an adult convicted of first degree murder runs against the national consensus, such a sentence is not unconstitutional on its face.

Codrington also asserts that his sentence, as applied to him, violates the Eighth Amendment. In evaluating an as-applied challenge, courts must first consider the proportionality of the sentence to the offense "by comparing the gravity of the offense and the severity of the sentence." *Id.* at 2022. "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality," the court should then proceed to the second step of the analysis — comparing the defendant's sentence to others in the same jurisdiction, and to those convicted of similar crimes in different jurisdictions. *Id.* (citing *Harmelin v. Michigan*, 501 U.S. 957, 1005, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991)).

Codrington did not address the proportionality of his sentence, perhaps because he committed one of the gravest offenses possible — if not the gravest offense possible — first degree murder. Even if Codrington had discussed the proportionality of his sentence, a life sentence is not grossly disproportionate for first degree murder, especially when viewed in light of United States Supreme Court cases which have upheld a life sentence for, among others, possession of cocaine, stealing golf clubs, obtaining money by false pretenses, and stealing video cassettes. *See Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003); *Harmelin*, 501 U.S. at 1005; *Rummel v. Estelle*, 445 U.S. 263, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980). Because the severity of a life sentence without parole is not grossly disproportional to the gravity of first degree murder, we need not compare Codrington's sentence to other sentences within this jurisdiction or sentences imposed in other jurisdictions for similar crimes.

 In summary, Codrington failed to demonstrate why *Graham*'s holding — that a life sentence for a juvenile who did not commit a homicide is unconstitutional — should be extended to cover a life

197

sentence for an adult who did commit a homicide.[12] Moreover, Codrington presented no evidence that his life sentence for committing first degree murder is grossly disproportionate to the severity of a first degree murder. Accordingly, Codrington's sentence does not violate the Eighth Amendment prohibition against cruel and unusual punishment, either on its face or as applied, and the Superior Court did not err in sentencing Codrington to life in prison without parole.

## 8. The People presented sufficient evidence to convict Codrington of possession of stolen property.

Codrington's final argument is that the evidence presented at trial was insufficient to sustain his conviction for possession of stolen property. Specifically, Codrington argues that there is no evidence in the record that he took the items that the police discovered in his trunk from the Aguilars' home, no evidence that he exercised any control over these items, and no evidence that he was aware that the stolen items were in the car. Codrington raised this argument to the Superior Court by moving, both following the prosecution's case and at the end of trial, for a judgment of acquittal. The Superior Court denied both of those motions. Our review of these denials is plenary, and we apply the same test as the trial court. *Stevens*, 52 V.I. at 304. "We will affirm a conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith*, 51 V.I. at 398.

The Virgin Islands Code makes it a crime to possess "any property which has been obtained in any unlawful manner, knowing or having cause to believe the property to have been so unlawfully obtained . . . ." 14 V.I.C. § 2101. Accordingly, to convict an individual of possession of stolen property, the government must establish that the individual possessed certain property, that such property was stolen, and that the individual knew or had reason to believe the property was stolen. *See* 14 V.I.C. § 2101; *see also Joseph v. People*, 50 V.I. 873, 886-87 (D.V.I. App. Div. 2008).

---

[12] We recognize that, subsequent to the briefing in this case, the United States Supreme Court issued *Miller v. Alabama*, 132 S. Ct. 2455, 183 L. Ed. 2d 407, 432 (2012), which extended *Graham's* holding and found that a juvenile who has committed homicide may not automatically receive a sentence of life without parole without being given the opportunity to offer mitigating circumstances. Nevertheless, because Codrington was not a juvenile at the time of the murder in this case, *Miller* — like *Graham* — provides him with no relief.

The evidence presented at trial showed that property belonging to the Aguilars was in the trunk of Codrington's car at the time of the shooting. Evidence also showed that Codrington's car was first spotted driving up a dead-end road next to the Aguilars' home shortly after they discovered the burglary, and that Mr. Aguilar followed this car from his home to the Sapphire Beach Resort. Further, Codrington told police, in a statement introduced at trial, that he helped a stranger place the items in his trunk and that they were contained in a black garbage bag. Yet, when the items were recovered, no black garbage bag was present.

Codrington does not dispute that the items were stolen. Rather, he claims that he did not exercise control over the items. In other words, Codrington disputes that he possessed the stolen items. However, the police recovered the items from the car Codrington was driving, and Codrington himself acknowledged that he helped place the items in the trunk at a time when he was in control of the car. Such evidence is sufficient for a jury to find, at the very least, constructive possession of the items, because a jury can infer that the driver of a car constructively possesses items when those items are found in the trunk of the car and the driver has knowledge that the items are present in the car. *United States v. Lopez*, 271 F.3d 472, 487, 44 V.I. 311 (3d Cir. 2001). *See also United States v. Iafelice*, 978 F.2d 92, 96-97 (3d Cir. 1992) ("Constructive possession necessarily requires both, 'dominion and control' over an object and knowledge of that object's existence."). Like any other fact, constructive possession can be proven by circumstantial evidence. *See, e.g., Alfred v. People*, 56 V.I. 286, 293-294 (V.I. 2012) (citing *State v. Frieze*, 3 Neb. Ct. App. 263, 525 N.W.2d 646, 653 (1994) (explaining that "constructive possession may be shown by the accused's proximity to contraband at the time of the arrest or by the showing of ownership, dominion, and right to control of an automobile in which contraband was found")).

■■■ Codrington also contends that the People presented no evidence that he took the items or knew the items were stolen. However, to sustain a conviction for possession of stolen property, the People do not need to prove that Codrington took the items, just that he knew or had reason to believe the property was stolen. In this case, the People presented sufficient evidence to allow a jury to rationally infer that Codrington knew the items were stolen. As the Third Circuit has explained, "recent possession of the fruits of the crime, if not satisfactorily explained, is a

circumstance from which the inference may be drawn that the possession is guilty possession." *See Gov't of the V.I. v. Blyden*, 626 F.2d 310, 313-14, 17 V.I. 623 (3d Cir. 1980) (finding that trial court could infer defendants were involved in theft when defendants were passengers in a van, the police stopped the van shortly after property was stolen, and the stolen property was in plain view of the defendants at time of the stop). Further, when a vehicle leaves the scene of a crime in a "furtive manner," that adds additional support to the conclusion that all the individuals in the vehicle were involved in the crime. *Id.* at 314. Here, as in *Blyden*, "in view of the short period between the time when the items had been taken until the [the shooting], the [jury] could infer that the defendant[] [was] present at the time the property was taken." *Id.* at 314. Indeed, Codrington drove the vehicle in which the police found the stolen property in front of the house from which the property was stolen very shortly after the theft, and attempted to evade the owner of the property when the owner followed him. Accordingly, based on Codrington's possession of the stolen items shortly after they were taken, proximity to the location of the theft, and furtive behavior in attempting to evade Mr. Aguilar, the jury could have reasonably inferred that Codrington knew the items were stolen.

Because there was sufficient evidence to support the inferences that Codrington possessed the items found in the trunk of the car and knew those items were stolen, there was sufficient evidence to support his conviction. Therefore, the People presented sufficient evidence to convict Codrington of possession of stolen property.

## IV. CONCLUSION

None of the eight alleged errors presented by Codrington require reversal or any other remedy. Therefore, we affirm the judgment of the Superior Court on all counts.